## Ashland Sanitary Milk Company v. Messersmith's Administrator.

(Decided November 18, 1930.)

92

R. D. DAVIS and WAUGH & HOWERTON for appellant.
GEORGE B. MARTIN and MARTIN & SMITH for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

On June 29, 1929, Janet Lee Messersmith, a girl about ten and a half years of age, was struck and killed by a Dodge motor delivery truck belonging to the Ashland Sanitary Milk Company, and driven by one of its employees. This action by her administrator to recover damages for her death resulted in a verdict and judgment in his favor for $15,000. The Ashland Sanitary Milk Company appeals.

Janet Lee Messersmith lived with her parents on the south side of Blackburn avenue in the city of Ashland. Blackburn avenue runs east and west, is a paved street, and is about 20 feet in width from curb to curb. It has no sidewalks, but a level space of about 5 feet has been left on either side for that purpose. The Messersmith lot is 40 feet in width and is higher than Blackburn avenue. The entrance to the house, which is about the center of the lot, is by means of a concrete walk about 5 feet in width. Traveling from the west on Blackburn avenue toward the Messersmith residence there is a descending grade for a considerable distance. The accident happened about 4 o'clock on a bright afternoon. Accompanied by her daughter, Janet Lee, Mrs. Messersmith had driven her Dodge sedan car downtown to do some shopping. On her return she had a lot of groceries and provisions in the machine. On reaching a point in the street opposite her residence, she ran the right wheels of her machine over the curb so as to leave it parked with as little of the machine out in the avenue as possible. According to Mrs. Messersmith, she alighted from the car by the door at her left and stepped into the street, and then assisted her daughter to alight through the same door. She then started across the street. When she got to the middle of the street she saw the truck coming about 200 feet away. She had driven an automobile for nine years, could look at a car and tell at what speed it was

going, and she judged that the truck was going between 40 and 45 miles an hour. Her daughter was standing on the sidewalk when she was struck by the truck. At the time she was struck the truck was going pretty fast, but the driver had his foot on the brake and had probably reduced the speed to some extent. Elwood Blair, a mechanic who worked for the American Rolling Mills, was in bed at the time, and his attention was attracted by the noise of the brakes on the truck. He then went to the window, and in his opinion the truck was running about 40 miles an hour after the brakes had been applied. On the other hand, Claude Ireson, the driver of the truck, testfied as follows: He first saw the little Messersmith girl and her mother when about 150 feet away. The mother was standing at the car, seemed to be getting something out of it, and the child was standing just slanting back from the mother. They were both on the north side of the street and on his left. When he saw them he raised his toe off the accelerator. At that time they were making no effort to cross the street. When he got within 10 or 11 feet of where they were, the child darted across the street. Her mother screamed, and he tried to avoid hitting the child by cutting his car to the right, thinking the child would go back. If he had been 6 inches further over he would have missed her. His left front fender struck the child. When within about 30 feet of the child he put his foot on the brakes. At that time he was going between 18 and 20 miles an hour. He did not know that the child was going across the street. At the time of the accident the car was slowed down to about 15 miles an hour. The reason he took his foot off the accelerator about 150 feet back was that he was afraid they might start across the street, and there might be danger of hurting some one. He could see the child and he thought that they would see him. At the time he put on the brakes he was between 10 and 15 feet of where Mrs. Messersmith was standing. Running at 15 miles an hour he could stop within 20 or 25 feet. He cut in toward the telephone pole for the purpose of stopping. His main purpose was not to hit the child. Russell Rose testified as follows: He and some other children were playing in an open field about 100 feet north of the point of accident. When Mrs. Messersmith drove up, she got out, started up the steps, looked back and told Janet to stay there. Janet came right on. He then looked over at the milk truck and it hit her. The front fender struck her

first. Janet was in the street and was carrying groceries across the street. The truck ran about 20 feet after it struck her. The witness concluded his direct examination as follows:

"Q. 40. Did you see the little girl get out? A. Yes, sir.

"Q. 41. Which side did she (decedent) get out? A. She got out on—the opposite side her mother did.

"Q. 42. When the little girl first got out where did she go? A. She went around back of the car.

"Q. 43. Back of their car? A. Yes, sir.

"Q. 44. After she came around behind the car, how soon was she struck by this car. A. I just don't know how long it was—just."

The first error relied on was the failure of the court to give an offered instruction presenting the sudden appearance doctrine. In this connection it is insisted that appellant was entitled to such instruction not only on the evidence of Ireson, the driver, but on the evidence of witness Russell Rose. Whatever may have been the view of the court in years past, we have been inclined in recent years to confine the sudden appearance, in so far as infants are concerned, to cases where the injured infant leaves the sidewalk or emerges from behind another vehicle or other obstruction, and appears on the highway in the path of the on-coming vehicle so suddenly that the driver thereof in the exercise of ordinary care could not have prevented the collision with the means at hand if he had been running at a reasonable rate of speed. Metts' Adm'r v. Louisville Gas & Electric Co., 222 Ky. 551, 1 S. W. (2d) 985. Whether, in view of the driver's evidence that he saw the child standing by her mother in the street when 150 feet away, we would hold that the sudden appearance instruction should have been given if the witness Rose had actually testified that the child came from behind her mother's machine and rushed suddenly in front of the approaching truck, we need not determine. As a matter of fact, he did not say how long it was after the child came from behind the car before it started across the street. Thus there was no evidence tending to show that she was not standing by her mother in full view of the driver, as he repeatedly testified, when she started across the street. Clearly the circumstances were not such as to call for a sudden appearance instruc-

tion. The street was only 20 feet in width. The mother and child were standing in the street on the south side of the car in plain view of the driver of the truck, and only a short distance away from the path of the truck. The situation was such that the child might be expected to move in the pathway of the truck at any time. Notwithstanding this fact, no warning of the approach of the truck was given, and just before the accident the speed of the truck was about 15 miles an hour according to the driver of the truck, and from 40 to 45 miles an hour according to other witnesses. It would be a harsh rule were we to hold, in the face of such clear evidence of negligence, that appellant could escape liability on the theory that the child appeared so suddenly in the pathway of the truck that the driver could not have avoided injuring her if he had been running at a reasonable rate of speed.

Another error relied on is the alleged misconduct of counsel on the voir dire examination of the jurors. The facts disclosed by the bill of exceptions are these: Norman Berry, who was on the list, was asked to state his occupation. He answered that he was in the real estate business. Thereupon counsel for plaintiff inquired of him in the presence of the remaining members of the panel whether he wrote any insurance in connection with the real estate business, and he answered that he did not. John S. Hager, another member of the list, was asked if he had any connection with the Ashland Sanitary Milk Company. He answered that he had no connection with the company other than it was a customer of his, and he bought milk from them. He was then asked by counsel for plaintiff what kind of a customer it was of his, and he answered, "Insurance." Counsel inquired what kind of insurance he wrote for the defendant, and he answered, "Fire, theft and casualty." Thereupon counsel for plaintiff called counsel for defendant, and also the prospective juror, John S. Hager, to the desk of the court, and there privately, and not in a tone to be heard by other jurors, inquired of Hager if he was on this particular risk through any policy of insurance in any of his companies. Thereupon counsel for the defendant moved the court to discharge the entire panel of eighteen because of counsel's reference to insurance in the interrogation of the two jurors, which motion was overruled. In the case where we condemned the practice of interrogating prospective jurors with reference to accident insurance, the

jurors were asked whether any of them owned any stock in the insurance company which carried the indemnity policy on defendant's mine, and on objection the attorney for plaintiff stated that he had been informed that the coal company carried insurance in a company that would pay any loss that might result to the defendant on the trial of the case. W. G. Duncan Coal Co. v. Thompson's Adm'r, 157 Ky. 304, 162 S. W. 1139. It will thus be seen that counsel for plaintiff in that case not only brought directly to the attention of the prospective jurors the fact that defendant carried accident insurance and that the loss would fall on someone else, but inquired whether or not any of them owned any stock in the insurance company which carried the indemnity policy on defendant's mine when it was wholly improbable that such was the case, thus evincing a lack of good faith in propounding the question. A different situation is presented in the case under consideration. Naturally counsel for plaintiff would not want on a jury any one who had written indemnity insurance for the defendant, or any other insurance that would place him under obligation to the defendant. As real estate agents generally conduct an insurance business, it was not improper to ask Berry if he wrote insurance, and so far as he was concerned the matter ended with his answer in the negative. As Hager conducted an insurance business in the city where defendant's plant was located, the preliminary questions were not out of place, and as counsel for plaintiff was careful not to ask in the presence of the other jurors whether he carried the particular risk, we see no reason to doubt counsel's good faith in the matter. We therefore hold that the trial court did not err in refusing to discharge the entire panel.

Another contention is that the court erred in admitting the photograph of the deceased. It is insisted that its admission was prejudicial, in that it presented to the jury a very beautiful young girl, and was thus calculated to excite their sympathy and prejudice. It may be conceded that the admission of the photograph without proof of its accuracy by the photographer was technical error, but in view of the fact that the health, strength, mental capacity, and personal appearance of the child were fully discussed and presented to the jury by other witnesses, we are not inclined to hold that the admission of the photograph was prejudicial.

Still another contention is that the court erred in not granting a continuance on account of the absence of the witnesses, Hobart, and Aderine Pope, for whom subpoenas had been issued and returned, "Not executed," with the notation that they had gone to Arizona. In the affidavit it was stated that if the witnesses were present they would testify that they lived on Blackburn avenue across the street from the home of the deceased and within a few yards of the scene of the accident; that at the time of the accident they were playing in a field about 100 feet north of the point of accident where defendant's truck struck deceased, that they heard the brakes of the truck go on and that they looked up immediately and saw the truck, and that it stopped almost immediately after the brakes went on; that it went only a few feet after the brakes were applied; and that the deceased was struck while she was in the street and not on the curb. It was further alleged that defendant had had no opportunity to take the depositions of the witnesses because he did not know that the witnesses had left the jurisdiction of the court; that if the case were continued to the next term of the court defendant could either have them present in court or take their depositions as it desires one or the other to be done. There was the further allegation that the true and proper effect of the testimony of the witnesses could not be had without their personal presence in court. It being alleged in the alternative that defendant could either have the witnesses present at the next term of the court, or take their depositions, it is at once apparent that there is no showing that their actual presence could be had. That being true, the only way to secure their evidence was by deposition. Rarely, if ever, is the evidence of an absent witness taken by deposition as strong as that contained in an affidavit for continuance. In view of these considerations, and of the fact that the affidavit for a continuance was permitted to be read as the depositions of the absent witnesses, we conclude that the trial court did not abuse a sound discretion in refusing the continuance.

Lastly, it is insisted with great earnestness that the verdict is excessive. The case is not to be determined by decisions of the long ago. Within recent years the purchasing power of money has decreased, and the courts are inclined to uphold larger verdicts than they were accustomed to approve years ago. The deceased was

sound in health and of fine mental attainments, with all the opportunities that are now open to the members of her sex. In a case of this kind it is the province of the jury to assess the damages, and our duty to give effect to its finding unless we can say the verdict is so excessive as to strike us at first blush as being the result of prejudice or passion. This we cannot do.

Judgment affirmed.

Whole court sitting.