## City of Madisonville v. Nisbet's Administrator.

(Decided Oct. 19, 1937.)

L. R. FOX and H. F. S. BAILEY for appellant.

CHAS. G. FRANKLIN and WADDILL, LAFFOON & WADDILL for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

The appeal is from a $5,000 judgment for death.

Madisonville owns and operates an electric distribution system for lighting its streets and selling electricity to its citizens. The electricity is distributed from the municipal building. After leaving the municipal building there is no connection between the wires carrying current to light the streets and the wires carrying current for lighting homes and commercial purposes. At the northwest corner of Kentucky avenue and Lake street, where the decedent died, a pole was set in the pavement, and on the other side diagonally across was another pole. The electric street light is suspended over the center of the intersection of Kentucky avenue and Lake street, and is swung from a wire strung between the two poles. To this wire, called a span wire, is fastened a pulley chain which runs from the top of the street light through a pulley fastened to the suspension wire at the center of the street, thence to the pulley on the northwest corner of Kentucky avenue and Lake street, and through another pulley at the side of the pole, thence down the streetside of the pole, where it is fastened. Near the bottom of the chain there is an insulator four inches long with its top about seven feet and one inch from the ground. The chain is used to raise and lower the street light. Attached to the poles are wires carrying 110 volts for lighting homes and a wire carrying 2,200 volts for street lighting purposes. The two wires from the 2,200-volt wire, called feed or lead wires, conduct the current to the street light. The span wire and pulley chain are between the feed wires and not far apart.

Between 1 and 2 o'clock on the morning of August 11, 1935, the decedent, Ollie Cary Nisbet, and some other negroes were standing at the intersection of Kentucky avenue and Lake street. Nisbet raised his hand above his head, placed it on the pole, and fell dead. Of those present Leroy Marshall, Grace Gordon, and Robert Bronaugh testified. Leroy Marshall described the accident in the following language:

"He just leaned up against the post like that [indicating a position with his hand against the post] and Grace Gordon said, 'Look there;' and I looked and fire was flying from his feet, and he fell out backwards."

Marshall also testified that he examined the de-

cedent's hand after the accident, and saw that his hand was burned. Decedent placed his left hand on the pole, and the chain was within his reach. According to Grace Gordon, they were going home and stopped on the corner. They were talking and Ollie Cary "got tickled" and leaned against the post touching the post with his hand at a place slightly above his head. There was a hissing noise and something that looked like fire flew from his feet and he fell back. She did not see him grab the chain He placed his hand on the north side of the post. It was dark and windy and had been raining. Robert Bronaugh described the occurrence in the following language:

> "He walked up beside the post and put his hand up like that [indicating a position about even with his head]. I was standing in front of him and I seen fire fly out from his feet and he fell over backward like that [indicating]."

Decedent did not pull or jerk the chain. As soon as he put his hand against the post, it knocked him plumb loose from it. The night was "kind of windy and rainy." Doug Barbee, who was a member of the coroner's jury, testified that he saw decedent's hand the night of the accident, and there was a light burn across the palm. It had been sprinkling rain, and the wind had been blowing. Other witnesses who examined decedent's hand shortly after the accident testified that it was burned, and that it was a rainy, windy night, one of them saying that the wind was "rough," and another saying that it was sort of a blustery night. Dr. A. F. Finley testified that he examined the decedent's hand next morning and found burns in and around his thumb along that part of the hand where the metacarpal bones joined the palm. In his opinion the decedent was electrocuted.

On behalf of the city, Hall Arnold, superintendent of the Light & Water Plant, testified as follows: One of the night policemen called him about 2 o'clock. He called Jasper Gentry, night trouble man, and they went to the scene of the accident. He went up the pole himself and laid his hand on it, saw nothing wrong with the insulator, and placed his hand on the pole below the insulator and felt nothing at that point. He also took hold of the chain below the insulator, after he had examined the insulator, and found it to be o. k. On being

asked to tell the ways by which the chain might become charged he said:

"If the lamp was defective, a break down in the lamp, the chain would become energized, or a failure of the insulator on the end of the cross arm supporting the wires fastened in to the lamp, or swinging, violent swaying of the lamp could produce, or cause, one of the leads to the lamp to come in contact with the chain, or one of the jumper leads, leading from the cross arm off to the lamp above the lamp to come in contact with either the chain, or the cross arm that supports the wires leading to the lamp."

He added that when they got there everything was in normal operating condition, no current on the chain and nothing out of fix. Witness also testified that the next morning he and several others went to the scene of the accident and made a test, but the court declined to permit him to give the result of the test. Jasper Gentry, who accompanied Arnold to the scene of the accident, testified that the equipment there was of standard construction, and that he made an inspection and could not find anything wrong at the top of the pole.

The morning after the accident Mr. Arnold, accompanied by M. F. Beisber, J. L. Walker, M. E. Johnson, O. C. Hinton, Ruby Siria, and Jasper Gentry, all of whom had more or less experience as electricians, went to the scene of the accident and carried instruments with them to test the equipment. Their evidence is in substance as follows: At the time of the test there was a voltage of 2,200 on the wires. They tested the chain both above and below the insulator, and there was no electricity at either place. They sent a man up the pole, and he violently shook the lamp until the chain came in contact with one of the lead wires, and the instrument showed the chain to be momentarily charged above the insulator. The lamp was then violently shaken and there was no electricity in the chain. The lamp, which was insulated, was examined, and there was nothing wrong with it. If Nisbet had had his hand above the insulator, and had violently jerked the chain so that it came in contact with one of the lead wires, he would have been electrocuted immediately. The only way that the chain could have been charged was for the porcelain at the top of the lamp to have been broken, or

for the lamp to have been violently shaken by the wind, or by the jerking of the chain.

It is first insisted that the evidence is insufficient either to take the case to the jury or to sustain the verdict. At the outset it must not be overlooked that a city engaged in distributing electricity for the purpose of lighting its streets is not performing a governmental function relieving it of liability, Board of Councilmen of City of Frankfort v. White, 224 Ky. 570, 6 S. W. (2d) 699, but its duties and obligations are the same as those of any one else engaged in the same work, City of Owensboro v. Knox's Adm'r, 116 Ky. 451, 76 S. W. 191, 25 Ky. Law Rep. 680. Therefore, it is under the duty always to exercise the highest degree of care to protect persons along the streets. Kentucky & West Virginia Power Company v. Riley's Adm'r, 233 Ky. 224, 25 S. W. (2d) 366; Conn v. Lexington Utilities Company, 233 Ky. 230, 25 S. W. (2d) 370, 373. As said in the last-mentioned case, "Electricity is not only dangerous, even deadly, but it is invisible, noiseless, and odorless, rendering it impossible to detect the presence of the peril until the fatal work is finished. It is for this reason that the high duty is imposed, and being imposed, a breach of it fixes liability for the resulting injury to those to whom the duty is owed." The decedent was not a trespasser, but was on the street, where he had a right to be, and might naturally be expected to lean against and place his hand upon the pole. Clearly he was one to whom the city owed a duty.

We come then to the question of negligence.

On behalf of appellant it is pointed out that all the experts agree, and the tests all show, that it was impossible for the decedent to have been killed by coming in contact with either the pole or the chain. That the evidence of the experts is direct and positive, and quite persuasive, cannot be doubted, but the other side of the picture cannot be overlooked. The decedent was in good health. According to those present he put his hand on the pole, fire flew from his feet, and he fell over dead. No effort was made by the city to have him examined, or to obtain the opinion of a physician as to the cause of his death. The only physician who testified on the subject said that the decedent's hand was burned, and that in his opinion the decedent was electrocuted. It is not even suggested that the electricity which killed

him could have come from any other source than the pole or chain. On this showing we cannot say that a peremptory should have gone, or that the verdict is flagrantly against the evidence.

Complaint is made of the refusal of the court to permit Brick Southworth, local government observer for the weather at Earlington, to testify as to what his record showed. There can be no doubt that a weather bureau report is admissible for the purpose of showing the condition of the weather at the time and place the report is taken, Village of Evanston v. Gunn, 99 U. S. 660, 25 L. Ed. 306, but that is not the situation presented. The fact in issue was the condition of the weather in Madisonville between 1 and 2 a. m. on August 11th. The observations of the witness were made at 7:30 a. m. and 5:30 p. m. in Earlington, three or four miles away, and the witness admitted that it frequently rained at the Country Club between Madisonville and Earlington without raining at either place. As the observations were not taken either at the same place, or at the same time, the court did not err in excluding them from the jury.

There is the further contention that the court erred in not permitting Mr. Arnold to testify concerning the examination made the morning after the accident. It is true that Mr. Arnold stated that there had been no change in the condition of the equipment between the time the boy was killed and the time of the test the next morning, but, as he did not testify that the condition of the weather was the same, it may be doubted if his evidence should have been admitted. But, however this may be, several other witnesses who were present the next morning were permitted to give the results of the tests, and it is not perceived how appellant could have been prejudiced by the exclusion of Mr. Arnold's evidence.

It is insisted that the court erred in not giving the converse of instruction No. 1. We find at the end of the instruction the words "Unless you so believe you will find your verdict for the defendant." Manifestly the instruction is not defective in the respect claimed.

In instruction No. 1 the court told the jury that it was the duty of the City of Madisonville to use the utmost care and skill to so construct, maintain, and insulate its poles, wires, and equipment as to make them

free from danger to those who might come in contact with them while using the streets and sidewalks of the city as pedestrians. The point is made that the instruction made the city the insurer, in that it omitted the words "usually exercised by prudent and skillful persons engaged in the same business." We find, however, that in instruction No. 2 "the utmost care and skill" as used in instruction No. 1 were defined to mean "the highest care and skill known which may be used under the same or similar circumstances." It is unnecessary to review the cases on the question. In defining the duty of one engaged in furnishing or distributing electricity, the court sometimes uses the words "the highest degree of care and skill," and sometimes the words "the utmost care and skill," and there is practically no difference between the two expressions. In Bowling Green Gas Light Company v. Dean's Ex'x, 142 Ky. 678, 134 S. W. 1115, 1117, the language of the instruction was "the highest degree of care and skill which might be used under the same or similar circumstances," and it was held that the instruction was not subject to the same complaint now being made of instruction No. 1. In Lexington Utilities Company v. Parker's Adm'x, 166 Ky. 81, 178 S. W. 1173, the instruction imposed on the company the duty to exercise and use "the utmost care and skill," and in defining "utmost care and skill" the court employed the same language used in instruction No. 2. The court held the instruction substantially correct.

There was nothing in the appearance of the pole, the chain, or other equipment indicating that they were in a dangerous condition, and in placing his hand on the pole decedent was not guilty of contributory negligence as a matter of law.

The verdict is attacked as being excessive. The argument is that there was no evidence whatever as to the decedent's earning power, and in the absence of all evidence on the question $5,000 for death is excessive. It is undisputed that decedent at the time of his death was 27 years of age, and according to the Wigglesworth Table had an expectancy of 31.50 years, and according to the Carlisle Table an expectancy of 36.41 years. The jury, of course, had the right without any evidence of earning power, to exercise their own judgment in the matter and determine to what extent the decedent's earning power had been reduced. In our opinion $5,000

for the death of a young man in good health, and with an expectancy of over thirty years, is not excessive.

Judgment affirmed.