Thomas N. TEMPERLY, d/b/a Temperly Trucking Company, et al., Appellants,

v.

Harold D. SARRINGTON'S ADMINISTRATOR (Walter Brown), Appellee.

Thomas N. TEMPERLY, d/b/a Temperly Trucking Company, et al., Appellants,

v.

Beatrice SARRINGTON'S ADMINISTRATOR (Walter Brown), Appellee.

Court of Appeals of Kentucky.

May 25, 1956.

Rehearing Denied Oct. 26, 1956.

R. W. Keenon and Stoll, Keenon & Park, Lexington, William A. Hamm, London, Walter B. Early, Williamsburg, for appellants.

C. B. Upton, Williamsburg, for appellee.

WADDILL, Commissioner.

Upon the joint trial of these damage actions brought by the administrator of the estates of Harold D. Sarrington and Beatrice Sarrington against the appellants, Thomas N. Temperly, d/b/a Temperly Trucking Company, and Glenn Edward Kelley, driver of its truck, judgments for

$55,000 and $20,000, respectively, were recovered. With respect to the issue of negligence, both appellants urge that the court erred in overruling their motions for directed verdicts and for judgments notwithstanding the verdicts. Appellants also contend that: Improper questions were asked by appellee's counsel in qualifying the jurors; incompetent evidence was admitted; erroneous instructions were given by the court; and, the verdicts were grossly excessive.

The accident occurred during the afternoon of November 20, 1953, on Highway No. 25, when appellants' trailer-truck and the Buick automobile driven by appellee's decedent, Harold D. Sarrington, came into collision. As a result thereof Mr. Sarrington, who was 51 years of age, and his wife, Beatrice, age 54, who was a passenger in his car, were fatally injured. The truck was traveling north toward Corbin meeting the decedents' car which was going south toward Williamsburg. The highway has a 20-foot paved surface, and the drivers of the vehicles had an unobstructed view of the roadway as they were approaching each other for a distance of several thousand feet.

Appellee's evidence consisted chiefly of testimony given by witnesses who resided near the scene of the accident and by persons who arrived at the scene of the accident immediately after the collision occurred. Photographs of the vehicles in question taken soon after the accident, which were admitted in evidence by stipulation, tend to corroborate other evidence to the effect that the left rear side of the trailer came into contact with the left side of Sarrington's automobile. The physical evidence demonstrates the violence of the impact. Illustrative of that fact is that the rear set of wheels of the trailer was knocked out from under the trailer and the left side of the Buick was crushed against its chassis.

Under the facts and inferences which may be reasonably deduced from the evidence, liability resulting from the accident turns on the question as to which vehicle came into the wrong driving lane while they were passing, and thereby sideswiped the other vehicle.

Prior to trial it was stipulated that Harold D. Sarrington was operating the Buick automobile involved in the accident, and that Glenn Edward Kelley was driving the trailer-truck in question for its owner, the codefendant, Thomas N. Temperly, and was engaged on the business of Thomas N. Temperly when the accident occurred.

Harold West, a State Trooper, testified that he arrived at the scene of accident within five minutes after the wreck had occurred and found Sarrington's car headed against the ditch bank at the northbound lane of the concrete, partly off the road, with the rear of the car extending into the northbound traffic lane. He stated that he found Harold Sarrington under the steering wheel of the car, with his body lying across the seat; that Mrs. Sarrington's foot had caught on some object on the floor of the car and part of her body was in the car; that the right front door of the car was open, and the upper part of her body was hanging out the door. Trooper West stated he saw blood smears which started at the west edge of the pavement and extended across the highway to where the head of Mrs. Sarrington rested on the road; that he saw various articles which had been thrown out of the Sarrington car lying along the west shoulder of the road and in the private driveway of the Ballou residence which is located on the west side of the highway and approximately 20 feet north of where the collision occurred.

Trooper West stated that appellants' truck was off the highway on the east side of the road opposite the Barton filling station which is located on the west side of the road and about 295 feet north of the place where the vehicles collided. The trooper said that the rear set of wheels had been knocked from under the trailer and had rolled into a field on the east side of the highway; that it had been raining, causing the road to be slick, and the only marks which he found on the road after

the accident were two scuff marks appearing on the east side of the concrete, both located north of where the vehicles collided. Trooper West said that Kelley, the driver of the truck, had suffered a minor leg injury and that Kelley and the Sarringtons were removed to a hospital where the Sarringtons were pronounced dead.

Trooper West said he later questioned Kelley about the cause of the accident, and that Kelley said:

"There was a jeep in front of me making a left turn and the driver of the jeep had given a left turn signal with his arm out the window; I applied my brake and I don't know what happened; the trailer slid to the left and came around crossways the highway and into what would have been the southbound lane."

Two other witnesses, Wade Smith, a deputy coroner of Whitley County, and Foley Ruggles, a newspaper reporter, testified that they heard Kelley say in explaining how the accident occurred that he was going north toward Corbin and there was a jeep in front of him and the jeep gave a signal to make a left-hand turn and that he hit the brake, he hadn't seen this Buick, the road was slick, and the truck jackknifed on him and the rear end of his trailer struck the car; the trailer swung around and into the car. However, when Kelley testified he denied making the statement that his truck jackknifed and came into the southbound traffic lane and struck the Sarrington automobile. The trial court admonished the jury that the evidence given by West, Smith and Ruggles that Kelley told them his truck "jackknifed and came over in the southbound traffic lane and struck the Buick" was not competent against the defendant, Temperly.

Frazier Brooks, whose home is located approximately nine hundred feet north of the place of accident and adjacent to Highway No. 25, testified that during the afternoon of November 20, 1953, while he was in his front yard, he saw his neighbor, Mildred Carter, drive her car past his home traveling south on Highway No. 25. Brooks stated that when the Carter car reached the Barton filling station located on the west side of the highway, it almost stopped, then made a right turn onto another road. Brooks stated that a Buick automobile was closely following the Carter car when it passed him, and after the Carter automobile turned right off the highway, the Buick continued traveling south on Highway No. 25. Brooks stated further that when he heard the crash between the Buick and the trailer-truck, he looked down the highway and saw that the rear of the trailer was about two feet over the center of the road; that the Buick was propelled backward into the Ballou driveway, with the rear set of the trailer's wheels lodged into the side of the automobile; that the trailer's wheels became dislodged from the automobile, and both the automobile and the trailer wheels rolled out of the driveway, across the road into the ditch on the east side of the highway.

Mildred Carter's testimony supported that of Frazier Brooks in that she stated that she passed the Brooks home in her automobile and made a right turn off Highway No. 25 at the Barton filling station just prior to the collision that involved the Buick. She also stated that she had observed the Buick following her car prior to her leaving Highway No. 25.

Leland Roaden was driving a jeep north on Highway No. 25, on the afternoon of November 20, 1953, at a rate of speed between 15–20 m. p. h., when he observed appellants' truck about 500 feet behind him. Roaden stated that he desired to make a left-hand turn off the highway when he reached the Barton filling station which was then down the road about 1,000 feet, so he gave a left turn signal by extending his arm out the side of his vehicle. Roaden stated that after he had ceased giving the signal indicating a left turn, he again looked into his rear view mirror and upon realizing the truck was close upon him, he again signalled his intention to make a left turn by pointing over his head with

his right hand to his left. However, Roaden did not attempt to execute a left turn off the highway because he said:

"I was watching the truck and it was bearing close on me and I speeded my jeep up and then I noticed the trailer, or the hind end come around on the side. It slid a little bit toward the center line; I didn't see it go past the center line; I heard a noise that sounded like that trailer fell down."

Roaden stated that he did not see the Sarrington automobile approaching from the north, as he was watching the appellants' truck, and the first time he knew that appellants' truck and the Sarrington car had collided was when he got out of his jeep after he had parked it near the Barton filling station. He stated also that he had driven his jeep on the right side of the road on the occasion mentioned, and that appellants' truck overtook his vehicle before he reached the Barton filling station, and in attempting to pass his jeep on its right-hand side, the left front part of the bed of the trailer struck the right rear end of the jeep.

Glenn Edward Kelley testified that shortly before the accident he was driving a tractor-trailer truck headed north on Highway No. 25 toward Corbin; that it had begun to rain, and the road was wet and slick. He said that as he entered a straightaway portion of the highway he saw a jeep approximately 400 feet in front of his unit, which was also headed north. The jeep was traveling about 15 miles per hour and he was driving between 40–45 m. p. h. He saw the jeep slowing down and its driver gave a signal for a left turn off the road. As to what then occurred, Kelley said:

"I took my foot off the accelerator of my truck and just let it slow itself down; when I slackened off on this jeep, I touched the brakes on the trailer and the tractor, which are combined, and when I did so the trailer jerked a little, and when it jerked I took my foot off the brake and continued on down the road and in a man-

ner which took me off the edge of the road and I went onto the (east) berm and over a ditch."

Kelley said he did not see the Sarrington automobile until he stopped his truck across from the Barton filling station which is located on the west side of the highway and approximately 300 feet north of the place where he applied his truck brakes.

Kelley said that the over-all length of the tractor-trailer truck he was driving was 43 feet and 6 inches and about 7 feet wide. He denied that he made the statement that his truck jackknifed. He stated that at the time he applied his brakes on the truck he felt an impact upon his trailer, and at that time and during the entire occasion while following the jeep, his truck and trailer were being operated in the east driving lane of the highway. Kelley and several other witnesses examined the highway after the accident for physical evidence, and these witnesses stated that they found two scuff marks in the east driving lane which they located north of the place of collision.

■ From the foregoing statement of the facts and circumstances appearing in these cases it is obvious that the accident could have occurred in only one of two ways: Either because the Sarrington automobile came over on the wrong side of the road while passing the trailer; or, the trailer unit came over on the wrong side of the road and sideswiped the Sarrington car. Although Kelley testified that he had a clear vision of the highway in front of him for several thousand feet, he admits that he never saw the Sarrington automobile while it was approaching and passing his vehicle. This admission shows Kelley's failure to keep a proper lookout for other vehicles on the highway.

The evidence further established that when the Sarrington automobile approached and passed the jeep operated by Roaden, the Sarrington automobile was being driven to the right of the center of the highway. And when the Sarrington car immediately thereafter passed the front part of

appellants' truck-trailer the Sarrington automobile had then remained in its proper driving lane. We now look again to the evidence as to what occurred at that particular time. Kelley concedes that he was having difficulty in reducing the speed of his truck on the slick road to avoid running into the rear of the jeep which was immediately in front of him and which had signalled its intention to make a left turn off the highway; Kelley tried his brake, but released it quickly when he felt the trailer jerk. From that moment until the truck and trailer came to a stop after running into the right rear of the jeep, it is evident from those facts that Kelley had lost control of his vehicle.

In addition to those uncontradicted facts, we have to consider the testimony of Frazier Brooks, whose veracity was a question for the jury, who testified that he saw the trailer in Sarrington's driving lane immediately after he heard the crash caused by the colliding vehicles. Also, the photographs and other testimony point to the conclusion that the Sarrington car was being driven in its proper driving lane at the time the accident occurred. Therefore, appellee's evidence was sufficient to take the case to the jury, and the testimony of the witnesses for appellants that their trailer-truck was traveling on its right side of the center of the road merely completed the issue to be determined by the jury. The fact that the question presented is difficult of correct solution, or such as to excite doubt in the minds of the jury, does not make these cases a guessing contest within the rule forbidding that character of cases to be submitted to the jury. We therefore hold that the evidence as concerns appellants' negligence was sufficient to cause these cases to be submitted to the jury and to support the verdicts rendered. Taylor v. Vaughan, 236 Ky. 102, 32 S.W.2d 724.

The appellants complain of certain questions asked by appellee's counsel of prospective jurors on their voir dire examination. These questions sought to ascertain whether the jurors had conscientious scruples that would prevent them from returning verdicts in the full amount sought in the actions if the law and the evidence warranted such verdicts; and whether the jurors would make their own decision or would compromise their opinion in reaching a verdict. Appellants' counsel was then permitted to ask the jurors if they also felt free to return verdicts to the contrary if the law and instructions of the court justified it.

An important test of qualifications of a juror is his willingness to rid his mind of predilections and to be able to conscientiously give to the litigants a fair and impartial trial according to the evidence and the instructions of the court. Thus, in practice, counsel should be given a fair opportunity to question the jurors on voir dire to discover whether or not any of the prospective jurors have bias or prejudice in the case to be tried; the questions should be confined to matters directly affecting the legal qualifications of the jurors and such questions should be allowed which are pertinent to test the jurors' competency. But such examination ought not to be permitted to take a wide range concerning merely collateral matters. We have carefully considered the objections raised to the questions asked the jurors in the instant cases and find no abuse of discretion on the part of the trial judge concerning his rulings thereon. See, Wilder v. Louisville Ry. Co., 157 Ky. 17, 162 S.W. 557; Brumfield v. Consolidated Coach Corporation, 240 Ky. 1, 40 S.W.2d 356.

It is next urged that the court erred in admitting proof concerning the earnings of the decedent Harold D. Sarrington for several years prior to his death. Specifically, the point of objection is that some of Sarrington's earnings were from a road contracting partnership which had been dissolved shortly prior to his death. We think this evidence was competent not only to show Sarrington's wide business experience and capacity to earn money, but also in showing that he had made annually over $14,000 net profits during the last three years of his life from his busi-

ness ventures. In estimating compensatory damages, we have frequently held that the jury has a right to receive evidence on such elements as decedent's age, occupation, health, habits, accumulations, mental and physical ability and such evidence is not confined to earnings at the exact time he met his death. Consolidated Coach Corporation v. Earls' Adm'r, 263 Ky. 814, 94 S.W.2d 6; Louisville & N. R. Co. v. Massie's Adm'r, 138 Ky. 449, 128 S.W. 330; Louisville & N. R. Co. v. Hays' Adm'r, Ky., 128 S.W. 289. Also, we have held that failure to furnish the jury with proof of the decedent's earning power will not prevent them from exercising their own judgment in the matter and determining the amount of damages the estate has suffered. Heskamp v. Bradshaw's Adm'r, 294 Ky. 618, 172 S.W.2d 447; Reynolds v. Coburn, 285 Ky. 544, 148 S.W.2d 705.

Instruction number one required appellant, Kelley, to observe certain duties while operating his truck on the highway such as to operate his truck in a careful manner with due regard for the safety of other traffic upon the highway; to keep a lookout ahead for other vehicles in front of his truck or that appeared to be in danger from the movement of his truck; to have his tractor-trailer under reasonable control and not to operate it at a greater speed than was reasonable and proper having due regard for the traffic and the use and condition of the highway at that time; to watch for and observe signals given from other vehicles that were in front of him.

■ The instruction is criticized because it is insisted that there was no evidence that Kelley violated any of the duties imposed upon him under this instruction. We think the instruction given was fully authorized under this record: First, because there was evidence that Kelley was not keeping a "lookout ahead," since he testified that he did not see the approaching automobile of decedent until after the accident, when the physical facts show that he could have seen the approaching automobile of the decedent for a dis-

tance of several thousand feet; and secondly, because there was an issue for the jury as to whether or not Kelley was otherwise driving in a lawful manner at and immediately prior to the accident. Certainly, under the facts presented, this instruction contained no prejudicial error. See, Stanley's Instructions to Juries, Sections 113 and 114, and cases cited under these sections.

The next contention is that the verdict is excessive and was rendered as a result of passion and prejudice. The evidence heard on the trial of these cases established that Harold B. Sarrington and Beatrice Sarrington were in good health and had a life expectancy of 20.81 years and 18.68 years, respectively. There was evidence given by a certified public accountant, who had assisted in the preparation of Harold D. Sarrington's income tax reports, that Mr. Sarrington paid State and Federal income taxes on a net income of over $14,000 for the year 1953. The accountant further testified that he examined the books and records of Mr. Sarrington for the tax years of 1952 and 1951, and that Sarrington's net income for the three-year period next prior to his death averaged over $14,000. The evidence further established that Mr. Sarrington was a successful businessman and that he was engaged in several land development projects at the time of his death.

The proof shows that Beatrice Sarrington's occupation was chiefly that of housewife, and, also, that she supervised and received the rent from a tourist cottage which she and her husband owned.

■ While the damages awarded in these cases are large in this jurisdiction, we have said many times that verdicts of this character will not be disturbed unless they are so large and disproportionate to the probable loss as to strike the mind as being the result of passion and prejudice on the part of the jury. Measured by this rule, the verdicts do not appear to us to be excessive. Reynolds v. Coburn, 285 Ky. 544, 148 S.W.2d 705; City of Madison-

ville v. Nisbet's Adm'r, 270 Ky. 248, 109 S.W.2d 593; Ashland Sanitary Milk Co. v. Messersmith's Adm'r, 236 Ky. 91, 32 S.W.2d 727.

Other questions raised have been considered and also found to be without merit.

The judgments are affirmed.