## THE PERSEVERANCE.

## SHAMROCK TOWING CO. Inc., v. CORNELL STEAMBOAT CO.

District Court, S. D. New York.

Dec. 24, 1930.

Alexander, Ash & Jones, of New York City (Edward Ash, of New York City, of counsel), for libelant.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine and H. P. Elliott, both of New York City, of counsel), for respondent.

CAFFEY, District Judge.

The determining issues of fact in this case are, first, whether there was negligence

on the part of the tug Perseverance or the respondent company; and, secondly, if so, whether such negligence proximately caused the injury complained of to the brick scow Green Valley.

The items or specifications of negligence are alleged in paragraph 6 of the libel. They are twelve in number. Some I shall not discuss in detail, because in the proof there is no support whatever for them. These are items 1, 2, 4, 5, 6, and 12. Eliminating those, we are brought down, in effect, to three charges. These are, stating them only in substance:

(1) That the wind, water, and other conditions were too severe to warrant continuance of navigation with the tow or at least with the scow in the tow. This charge is embraced in items 3 and 9 of paragraph 6 of the libel.

(2) That there was failure to moor the scow in protected waters or in a harbor. This charge is covered by items 7 and 8.

(3) That the scow was improperly located in the tow because she was in the hawser tier, and should have been behind other boats in the tow so as to have the advantage of protection from them. This charge is in items 10 and 11.

Something is said in the libel about the Osceola or the position of the scow while in tow of the Osceola. Mr. Ash gave notice that he would argue that, prior to the transfer of the tow from the Osceola to the Perseverance, there had been failure to anchor the scow or leave her in a place of safety when there was opportunity and she was improperly in the head tier. I will comment later on these phases which relate to the Osceola.

It is impossible at this time for witnesses to state with perfect recollection or with perfect accuracy what were the wind conditions from the time the scow came into the tow of the Perseverance. In the same way it is impossible for them with certainty and precision to state the water conditions or the extent to which there was, or theretofore had been, rain during October 12th on the Hudson. I think nobody can doubt that records of the Weather Bureau are the best source of information as to direction or velocity of the wind and as to rainfall in so far as they are set down in those records. I therefore accept the Weather Bureau records. Nevertheless, the application of them, even in the hands of so learned and experienced a person as Mr. Scarr, is matter merely of estimate. According to Mr. Scarr, as I recall

what he said, the velocity of the wind was very likely to be less down on the water and at a lower level than that in the somewhat elevated place at which the observations of the bureau were taken. I think he also said, and it seems obvious, that the velocity would to some extent be influenced by the terrain in the locality being inquired into. I think he further said that it takes something like two hours before the effect of particular velocity recorded on top of the Whitehall building in this city would reach the location of the incident involved in this case.

■ Taking everything into account, his estimate, as I understand it, is that in the part of the river where the accident occurred the velocity of the wind at or about the time of the accident was probably between 40 and 50 miles an hour.

The testimony of the experienced navigators who testified is also entitled to considerable weight. They have been a great deal on the Hudson. They have made many observations of wind conditions in all parts of the river. Nevertheless, what they say is estimate merely, with the accompanying inevitable possible deficiency of recollection, ignoring any question of bias; and I do not think that there has been any very great exhibition of bias by the witnesses on either side, nothing except the ordinary experience with witnesses. The navigating men put the wind velocity at very much below the figure given by Mr. Scarr. The consensus of what they say is about 25 or 30 miles an hour.

It is perfectly impossible now, as between the varying estimates, to be sure just what the rate of the wind was.

The testimony with regard to rain on October 12th is not very full, and it is not satisfactory. At least it is insufficient to make us feel sure just what the precipitation was. We have no Weather Bureau records for the vicinity about rainfall. That there was some rain is certain. I think everybody agrees about that. Without further information as to degree, it is rather hard to reach a conclusion as to what the probable effect of the precipitation was.

Assuming, however, in favor of libelant's contentions, the most extreme conditions permissible under the evidence as to wind velocity and as to rain that day, after listening to all of these experienced men, both those engaged on the river that day and the experts heard on both sides, I fail to find in the proof any occasion for alarm or any substantial reason for anticipating injury to the tow or anybody in it by continuing the navigation.

Last night as I read cases which have been decided by some of the older local judges—particularly those dealing with navigation on the Hudson, in some of which the conditions of wind and water were vastly more adverse to operation of a tow than any possible view of the testimony in this case would warrant us to infer existed on October 12, 1927, in the part of the river that was traversed by either the Perseverance or the Osceola,—the thought came into my mind that the former experienced admiralty judges in this district who are now dead would rest a bit uneasily in their graves if they thought that navigators on the Hudson had fallen to such a low estate of virility as to refrain, or that this court were imposing on navigators an obligation to desist, from going ahead under conditions such as existed in the case at bar; that the sleep of these fathers of the admiralty law as administered in this court would be disturbed if they should learn that their successors of to-day had so far shifted away from what in the old days was permitted to, and indeed perhaps required of, navigators on the Hudson in handling their tows.

While I shall attempt no finding as to what was the exact velocity of the wind, from an examination of Exhibit 5—taking into account the records at New York and at Albany particularly, and interpreting them as best we can with the help of Mr. Scarr—coupled with the testimony of the navigators on the Hudson who have been passing over its waters for many years, it is not unlikely that between 5 and 6 o'clock p. m. on October 12th the wind velocity in the neighborhood of Newburg Bay was somewhat below the estimate given by Mr. Scarr. In addition, when we analyze rather carefully, as I have attempted to do, what he said on the stand, I doubt if he would disagree with that. If so, then this conclusion is somewhat fortified by the statements of those who were present on the river at the time.

Let me turn now to the second issue stated above:

If I be right in believing that wind and water conditions did not call on, or I think I may put it stronger and say, even suggest to, experienced navigators the discontinuance of the journey down the river with the scow included in the tow, then I think this substantially disposes of the contention that there was a duty by the tug to moor the scow either in protective waters or in some harbor.

As I understand the proof, there is no basis for saying that, having in view the water and wind conditions, the operation was

on the wrong side of the Hudson. In the testimony by libelant's witnesses themselves, I fail to discover anything that occurred while the scow was in tow of the Osceola, or anything that happened during the course of October 12th prior to passing Marlboro—apparently the last station of safety for mooring that was available before reaching Newburg—which suggested or should have suggested to those in charge of the tug that the scow should be cut out and tied up at Marlboro or above. Unless there was occasion to leave the scow at Marlboro or one of the several places mentioned by the witnesses high up the river, then there was no occasion to anchor her in protective waters.

Again, even if at the time of the shift of the tow from the Osceola to the Perseverance there had transpired anything to put the officers of either tug, or any representative of the respondent company, on notice that there was danger, by reason of retaining the scow in the tow, as I understand the testimony of the experts they agree that it would have been hazardous at that point to cut out the scow and to carry her back to Marlboro with the wind, which was then prevailing, from the south or southeast.

There is one thing, however, in that connection which is significant. This is that the testimony is wholly without dispute that the passing of the tow from one tug to the other was effected entirely without difficulty, with apparent perfect safety, and without anybody expressing at the time or even feeling any alarm. If that be so, then it seems clear that there was not then any demand or occasion for cutting the scow out of the tow and carrying her to Marlboro or anywhere else for shelter or mooring.

If what I have said about the conditions that prevailed on the Hudson be true, so far as concerns putting the scow either in protected waters or at any anchorage in a harbor, it applies just as much to the handling while in tow of the Osceola as at any other time.

That brings us to the third issue of fact: Was putting the scow in the hawser tier of the tow wrong?

There is some divergence in the testimony of the experts on this phase of the matter. It is necessary, however, to scrutinize rather carefully what they said—to bear in mind the precise forms of the questions addressed to them—in order to determine what weight the answers are entitled to. I am also greatly impressed by the testimony of the captain of the scow himself. He said that she had frequently been carried in the head tier; that it was nothing unusual for her to be carried there. After listening to the experts, I am entirely unconvinced that it was unusual, or that there was anything which would require experienced navigators to refuse, under the conditions of water and weather that prevailed on the Hudson that day, to carry in the first tier a scow of the type we are now dealing with.

What I have said thus far would perhaps be enough on the facts in respect to the three issues stated at the beginning; but I feel that consideration would be incomplete, unless effort were made to ascertain how the damage to the scow was brought about.

The accident to the Green Valley happened about opposite or just above the ferry slip at Newburg. It is established without dispute that the Perseverance took over the down-river tow below Roseton. It was done adjacent to Big Hill, which is about the upper end of Newburg Bay. The Perseverance had previously carried its up-river tow to New Hamburg, some 4 miles above Newburg. In order to get a correct picture of what followed, it is of consequence to note the times of the events in connection with the shift of the tows.

It appears in the towing sheet that the New Hamburg halt by the Perseverance of its up-river tow was at 4:50 p. m. It took approximately twenty-five minutes for the Perseverance to get back to Big Hill. The documentary proof puts it beyond controversy that the shift was complete by the hawsers of the Perseverance having been put on the down-river tow, at 5:30. The trouble of the scow was observed twenty minutes later. It had listed to port, and its captain had given a distress signal to the tug.

Capt. Foley of the Green Valley tells us that he put his hatches down the night of the 11th or in the early morning of the 12th. Mr. Martin, the only other man on the scow, says his recollection is that they were put down about noon of October 12th. Capt. Foley says that it was nothing unusual for the scow to ship water over the bow. He says he did not use his pumps at all during the entire day of the 12th. He says also that he kept the hatches down all day, that he made an examination at Roseton, and that it was then dry below. I believe he further said that he looked below at or about the time the Perseverance took over the tow. Both Foley and Martin were at the bow of the scow when the hawsers of the Perseverance were put on. They observed nothing out of the way. Not

only did they say nothing, but they saw nothing indicating danger to the scow. Roseton is a short distance only above where the accident happened.

It is a little difficult for me to feel confident what was the cause of the accident.

There is an allegation in the libel about the effect of the absorption of water by brick loaded on deck. Mr. Ash contends, however, that the listing of the scow to port was caused by water below deck. I think that is true. I should not expect that, with the brick loaded on deck in the way they were, even though they absorbed water to a considerable extent, there would have been a sufficiently uneven distribution of the resulting added weight to shift the deck load enough to the port side to bring about a list to port such as Capt. Foley and Mr. Martin say occurred. So I think that Mr. Ash is right in attributing the port listing to the presence of water in the scow below deck.

But when did it get in there? If under the description both of the rainfall, so far as we are told about it, and of water coming over the bow during the whole of the day down to Roseton, the scow was entirely dry below deck at Roseton as related by Capt. Foley, then the evidence wholly fails to establish so violent a change either in wind conditions or in rainfall or in water getting over the bow between Roseton and the time of the accident to enable me to believe that during that very brief interval there had been so great an accumulation of a quantity of water below deck as to cause the scow to list to port in the fashion Capt. Foley and Mr. Martin say she did list just before she was cut away from the other boats to her port and to her stern. Consistently with what the men on the scow say, I cannot account for the occurrence.

I think that perhaps there is some mistake by Capt. Foley. There is conflict in the testimony about the proper method for fastening down hatch covers of a scow of the character of the Green Valley. The experts disagree. The proof does not establish that the hatch covers or the methods of fastening them employed on the Green Valley were unusual. Capt. Foley says that he had previously passed up or down the Hudson with this particular scow, with water coming over the bow, without her having shipped sufficient water in the hold to capsize her or to do her injury otherwise. Scrutiny of all the evidence brings no explanation of how there accumulated in the hold of the scow enough water to bring about the catastrophe from which she suffered on October 12th. It may be that water got in through the ventilators. It may be that Capt. Foley is in error in his recollection as to when he last examined below deck with respect to water or as to whether or not the hatch covers continued to be fastened down tight. I do not know. No one hearing the testimony can be sure.

Such being my view of the facts, without pursuing further the attempt to learn why the scow sank, I pass to the law that is applicable:

It seems to me thoroughly settled that there can be no recovery unless negligence be shown; also that the burden is on libelant to establish negligence. I do not see any difference in the statement of the principles of law made in the cases cited by the respondent from that made in the cases cited by the libelant.

The duty of a tug having a tow, as in this case, is to exercise "reasonable skill, care and diligence." Those are the precise words used in Doherty v. Pennsylvania Railroad Co. (C. C. A.) 269 F. 959, with which we are all familiar. Judge Hough stated in Brigham v. Cornell Steamboat Co. (C. C. A.) 18 F.(2d) 92, 93, that in order to justify recovery "the tow must bear the burden of affirmatively showing that the injury received was proximately caused by some act or omission of the tug, inconsistent with that reasonable care and skill impliedly promised when the towage contract concluded."

Mr. Ash refers to Judge Woolsey's opinion in The Drifter (D. C.) 35 F.(2d) 1006, 1007. But Judge Woolsey relies on the Brigham Case, from which I have just quoted an extract. It is perfectly apparent that there was no intention to depart from the rule which has long stood in this district. Moreover, when the facts in The Drifter are examined, it is perfectly clear that, in talking about the presumption from damage found at the time the tug turned the tow back to its owner, Judge Woolsey was dealing with a case wherein there was an entire failure by the tug to explain "when, how, or where the damage happened." There is no occasion here to apply the presumption. In the case at bar, there has been quite full testimony as to when, how, and where the damage happened. We may not be able on all points to get such adequate information as will enable us to reach a certain conclusion as to what caused the accident; but, with the burden of proof on libelant, the deficiencies in that regard cannot be attributed to the respondent.

There is another thing to be borne in mind. It is brought out by Judge Hough in The Eli B. Conine (C. C. A.) 233 F. 987, relied on by Mr. Ash. It would not be fair, it is not the law, that navigators of craft be held to such a high degree of conduct that it is negligence if they make a mistake of judgment. Errors of judgment do not, as such, constitute negligence. We must go a good deal further. It is not necessary to establish recklessness, but, if competent navigators do what is reasonably required to bring their tows through safely under the circumstances as they exist, then they have lived up to that reasonable skill, care, and, diligence which is required by the law.

In this case I think it is clear that the Perseverance was in the hands of competent and experienced navigators. It is also clear that, after they had made the safe shift of the scow from the Osceola, there was nothing in the conditions that would lead them to think that there would be danger in continuing the journey down the Hudson. There was nothing about the wind or about the water to indicate peril. I think also that there was nothing at the time that would have suggested to experienced navigators that there was occasion to cut the scow out or to anchor her either in a port of refuge or in sheltered waters. I do not think there was anything to warn them that they should not proceed with the tow, including the scow.

While one expert may express one opinion and one expert may express another as to how it is better to make up a tow, that is not what we are concerned with. In order for the libelant to be entitled to recover because of the scow having been kept in the first tier, it is essential that it be established that it was, as I think Mr. Ash put it in some of his questions, bad seamanship, negligent seamanship; that it was not the exercise of reasonable conduct under the circumstances. Capt. Foley said that his scow had frequently been in the first tier. Mr. Erskine conceded the statement of Mr. Ash that the respondent company had frequently towed the scow on the Hudson without damage to her, though we are not informed about the varying weather or wind conditions. The evidence is undisputed that from the time the scow was put in the tow on October 11th she had proceeded down to the point of the accident without apparent injury. As the shift has been described by the witnesses, it seems to have been made in the usual and ordinary way—the natural way for conducting such a shift. I therefore see no way in which I can challenge the conduct of the master of the Perseverance in having the scow in the head tier or how I can say that there was anything about the conditions that should have impressed him that it was unreasonable to do so or that there was danger of injury to her from doing so.

So also as to the inclusion of the scow in the head tier when in tow of the Osceola. According to Capt. Foley, nothing then happened that contributed to bringing about the accident eventually.

Without going into further details, I accordingly find as a fact that the Perseverance and its master were not guilty of negligence. As matter of law, it follows that there should be a decree dismissing the libel.