COLLIE T. RIDDLE

*v.*

THE BALTIMORE AND OHIO RAILROAD COMPANY

(No. 10459)

Submitted September 24, 1952. Decided December 22, 1952.

734

LOVINS AND HAYMOND, JUDGES, dissenting.

*Samuel A. Powell, Kendall H. Keeney* and *Robt. B. Stotler,* for plaintiff in error.

*Wm. Bruce Hoff, Harry E. Moats,* for defendant in error.

RILEY, PRESIDENT:

In this action of trespass on the case, instituted by Collie T. Riddle against The Baltimore and Ohio Railroad Company in the Circuit Court of Ritchie County, plaintiff seeks to recover damages to his residence property, situate between Fream Street and Bunnells Run in the City of Pennsboro, Ritchie County, alleged to be due to the flooding of his property by the backwater of Bunnells Run, allegedly caused by defendant's negligence in maintaining an inadequate culvert under its railroad fill. To a judgment in the amount of $1,285.21, based on a jury verdict, the defendant prosecutes this writ of error.

Bunnells Run drains 1,250 acres of land north of the defendant's railroad fill and culvert in the City of Pennsboro. The run forks approximately 1,800 feet upstream from the culvert. From the forks to the culvert the run flows in a southwesterly direction. Plaintiff's property, which is approximately 1,300 feet upstream from the upper end of the culvert, faces Fream Street and its back or eastern line is contiguous with the center line of the run.

Several hundred feet below the Riddle property Bunnells Run flows under Raymond Street, a cross-street running in an easterly and westerly direction, and then under Church Street about 450 feet south of and parallel to Raymond Street. Several hundred feet to the south of Church Street the stream enters the upstream opening of the railroad culvert, and passing through for a distance of 121 feet proceeds to and under United States Route No. 50, which highway is to the south of and substantially parallel to defendant railroad company's tracks, which

are located on top of the fill and above the defendant's culvert.

The fill is 40 feet high from the floor of the culvert. The inside dimensions of the culvert are: height 8.9 feet; width 5.95 feet; the inside measurement between the end of the wings of the stone wing wall at the north end of the culvert is 11.3 feet; and the height of the arch of the culvert from the side walls is 3.1 feet.

The elevations of the bed of Bunnells Run above sea level are: at the north end of the bridge on U. S. Route No. 50, 813.26 feet; at the downstream end of defendant's culvert about 200 feet upstream above U. S. Route No. 50, 813.88 feet; at the upstream end of the culvert, 815.27 feet; at the north side of the bridge at Church Street, 821.50 feet; at the north side of the bridge on Raymond Street, 824.38 feet; and at the forks of the run above plaintiff's residence, 832.97 feet. At a point near the front door of plaintiff's residence on the walk connecting the residence with Fream Street, and at a point at the northerly side of Denton Davis' residence, situated a short distance south of plaintiff's residence, the sea level elevations are 834.88 feet and 832.65 feet, respectively.

Sea level readings of the high water marks taken by plaintiff's witness, Bernard Rinehart, a civil engineer, at an incinerator (821.29), approximately 65 to 70 feet downstream from the fill and on the basement wall of a store, designated in the record as "McCollough's Store" (837.84), 75 to 80 feet upstream from the fill, showed that the water above the fill attained a height 16.55 feet higher than the water below the fill. These readings support the testimony of defendant's witness, George M. Allen, who lived two hundred feet south of the fill, to the effect that the water was within one to one and a half feet below the top of the culvert on the lower side of the fill, plaintiff's testimony to the effect that the water was 14, 15, or 16 feet over the top of the culvert on the upstream side of the fill, and the testimony of Francis Harris, a member of the volunteer fire department of Pennsboro, to the effect that

some time before Bunnells Run had reached its height on the night of June 24 and 25, 1950, "The water was up over the mouth of the culvert and was still raising", so that this witness "couldn't see the mouth of the culvert, it was completely covered up." The high water marks on the inside walls of plaintiff's residence showed that the water had reached a height of twenty-five and a half inches above the floor; and using this figure in connection with the sea level elevation on the walk at the front door of plaintiff's house of 834.88 feet, the water level at the height of the flood was 837.77 feet above sea level at that point. Witness Allen also testified that there was a large volume of rainfall to the south of defendant's culvert, and that the water reached a height of one and a half feet over U. S. Route No. 50 at the bridge below the fill, which latter condition may be accounted for by the fact that another run empties into Bunnells Run to the north of and at the pier of the highway bridge.

When the fill was originally constructed during the years 1854 to 1857, two pipes, the size and diameter of which do not appear in this record, were installed by the Northwestern Virginia Railroad Company, defendant's predecessor, at which time the bottom land in this drainage basin from the upstream side of the fill to the forks of the run consisted largely of pasture and meadow land, having no buildings, paved streets or highways thereon. Shortly after the year 1915 there was gradually built on the land, composing the drainage basin of the run, paved streets, highways, and residence buildings, so that at the time of the rise of the waters of Bunnells Run on June 24 and 25, 1950, Church Street, Fream Street, Cross Street, and Raymond Street at the southerly end of the City of Pennsboro were paved and about eighty-five residence buildings had been constructed thereon.

No unusual flood of Bunnells Run is disclosed by this record from the time the present culvert was constructed in 1895 until about the year 1918, at which time a heavy rainfall caused Bunnells Run to flood twelve or thirteen

houses on Church and Fream Streets, which gave rise to claims for damages against the defendant railroad company by a number of the property holders whose homes were flooded. Actions, instituted against the defendant for the alleged damages, were compromised before trial on the basis of fifty per cent of the claims. Another heavy rainfall, occurring during the year 1948, caused Bunnells Run to flood above the fill, resulting in an accumulation of water to a depth of 2½ feet on Church Street and 18 inches in the home of Ben Collins, which faces on Church Street between Fream Street and Bunnells Run. In 1949 another heavy rainfall caused the flooding waters of Bunnells Run to cover Church Street to a depth of 10 to 12 inches; and other rainfalls occurring on frequent occasions caused the waters of the run to flood the land of one Avery Dodson, located north of the fill and south of Church Street.

About six o'clock on the night of June 24, 1950, it began to rain in Pennsboro and vicinity, which rain continued until about three o'clock on the following morning, with the heaviest rainfall occurring from nine o'clock on the night of the twenty-fourth until midnight, and from shortly after midnight until two o'clock on the morning of the twenty-fifth.

Plaintiff's witness, Sula Riggs, who lived about 1750 feet above defendant's culvert near the north end on the east side of Fream Street and slightly west of the forks of the run, testified that during the height of the flood of June 24 and 25, the current of Bunnells Run was going down Fream Street; that the water was quiet at the back of her house; and that one of her outhouses some distance up the left fork had water in it. This witness stated that in 1918 and again in 1948 the waters of Bunnells Run were within six inches of the height attained during the flood of June 24 and 25, 1950. On the basis of this witness's testimony it is evident that on the night and morning of June 24 and 25, 1950, the backwater north of defendant's culvert had extended to and beyond the forks of the run approximately 1800 feet upstream from the

culvert. This testimony is supported by Rinehart's calculations which established the sea level reading of the high water mark on the basement wall of McCullough's Store, above and north of the fill, at 837.84 feet, which is approximately 4.8 feet higher than the sea level of 832.97 feet at the bed of Bunnells Run at its forks.

Plaintiff's witness, Blanche Thomas, who lived on a lot in the City of Pennsboro north of Church Street and west of Fream Street, testified that in 1917 the water was up to her windowsill, approximately 6 feet from the ground; that in the following year the waters of Bunnells Run rose to the "pendulum of the clock on her mantel"; that later her house was moved 18 feet farther west to higher ground, at which time it was raised 3 feet; that in 1948 the waters of the run rose to within 10 inches of her side porch, after her house had been raised; and that during the flood of June 24 and 25, 1950, the water rose to a depth of 4 feet and 5 inches in her house.

Plaintiff's witness, H. I. Willis, a resident of Ironton, Ohio, who had been employed for six years as an engineer aide by the United States Army Engineers at Huntington, West Virginia, and plaintiff's witness, Victor T. Horn, a resident of Parkersburg, West Virginia, an employee of the United States Weather Bureau, a branch of the Department of Commerce of the United States, testified regarding activities of the weather bureau concerning precipitation in the West Virginia area northwest of the Allegheny Mountains, concerning flash floods during the twenty-four hour period of June 24 and 25, 1950, in the Counties of Doddridge, Gilmer, Harrison, Lewis, Pleasants, Tyler and Upshur, and particularly concerning the precipitation during the storm period in the Bunnells Run watershed, especially that portion of the watershed above the fill and culvert of the Baltimore and Ohio Railroad at Pennsboro. These witnesses testified concerning the use by the Government agencies of nonrecording and recording types of gauges at various points for the purpose of determining the precipitation at the point under investigation.

Willis testified concerning a bucket survey conducted by him and Ralph Perry of the United States Weather Bureau, bearing on the rainfall on the night of June 24 and 25, 1950, which survey was conducted outside the basin of Bunnells Run lying upstream from defendant's fill, as follows:

"A. Well, a heavy rainfall is reported and the field party, we go to the center and work in all directions making house to house calls and inquiring of the people as to their knowledge of the rain that fell at certain periods.

\* \* \*

"A. Inquiry is made as to their knowledge of the amount of rainfall that occurred in buckets or any container that may be measured and computed the depth of the rainfall that occurred."

Willis, while testifying generally concerning the use of the bucket survey in determining the amount of rainfall, did not of his own knowledge know how the bucket survey directed during the rainfall of June 24 and 25, 1950, was made. He did not testify, and perhaps could not, whether more than one person was interviewed at several points in making the bucket survey concerning the rainfall on the two days involved. He was, however, permitted to testify, over defendant's objection, that the custom generally followed in making such surveys was to inquire of several persons at the point where the survey was being made as to the extent of the rainfall at a certain time. The result of the bucket survey directed to the rainfall on June 24 and 25, 1950, was made within the West Virginia-West Union quadrangle, as shown by a geological survey of the United States Department of the Interior.

Plaintiff's witness Willis testified that on the occasion of the flood of June 24 and 25, 1950, the rainfall at Pullman, Ritchie County, a distance of 7.3 miles from Pennsboro, was 10½ inches. Both Willis and plaintiff's witness Victor T. Horn testified that on August 4 and 5, 1943, there was a rainfall at Sandfork on the Little Kanawha River, 27 miles from Pennsboro, of 15 inches, and at

Glenville, 25 miles south of Pennsboro, of 13 inches. Horn testified that on June 18, 1921, there was a rainfall at Smithfield in Wetzel County of 6.46 inches; and that in 1889 the rainfall at Rockport, in Wood County near Parkersburg, was 19 inches. Willis further testified that on August 4 and 5, 1943, at a point east of Yellow Creek, northeast of Grantsville in Calhoun County, 21 miles from Pennsboro, the rainfall was 10½ inches; that at Brohard, Wirt County, nearly 20 miles from Pennsboro, it was 9.4 inches; and that at Smithville, in Ritchie County, 16 miles from Pennsboro, it was 10.4 inches. Willis testified somewhat in detail that the six most satisfactory results of the rainfall of June 24 and 25, 1950, as shown by the bucket survey, were obtained at Identifier Points 124, 125, 130, 131, 132, and 133, Point 130 being at Pennsboro, which are set forth in a pamphlet designated "U. S. Department of Commerce, Charles Sawyer, Secretary, Weather Bureau, F. W. Reichelderfer, Chief", the rainfall was, respectively: plus 6.5 inches; plus 8.5 inches; 7 inches; 7 inches; 7.5 inches; and 7 inches. A comparison of the longitude and latitude of the station at Pennsboro (Point 130) with the longitude and latitude at each of the other five stations, as set forth in the pamphlet issued by the United States Department of Commerce, shows that Identifier Points 124, 125, 131, 132, and 133, are in the West Union quadrangle within the vicinity of defendant's culvert and fill at Pennsboro.

From Willis's testimony it appears that the investigators in making the bucket survey of the rainfall on June 24 and 25, 1950, if they followed the custom prevailing in the Weather Bureau, did not make inquiry of persons as to the result of the rainfall, but the inquiry was directed to the identity of buckets found at various places and upon sufficient identification the investigators themselves made the measurements to ascertain the amount of rainfall in terms of inches.

During the course of the trial plaintiff introduced in evidence a photostatic copy of a large isohyetal map made under the direction of the Department of Commerce,

covering a large portion of northwestern West Virginia, and exhibited to the jury the original map. This map, because it was an official Government record, could not be put in evidence. Objection was interposed by counsel for defendant to the exhibition of the original map without its introduction.

Over defendant's objection, the court admitted in evidence, as plaintiff's Exhibit No. 5, a pamphlet entitled "U. S. Department of Commerce, Charles Sawyer, Secretary, Weather Bureau, F. W. Reichelderfer, Chief, Climatological Data West Virginia, June, 1950, Volume LVIII No. 6", and as plaintiff's Exhibit No. 5a, pages 93, 94, and 95 of Exhibit No. 5, which pages are entitled "Supplementary Precipitation Data For the Period June 24 to 25, 1950. West Virginia."

The following specific grounds of error are set forth in defendant's brief: (1) The introduction of evidence as to rainfalls on the night of June 24 and the morning of June 25, 1950, not within the drainage basin of Bunnells Run; (2) the introduction of evidence as to prior rainfalls not within the drainage basin of Bunnells Run; (3) the introduction of evidence as to the custom or practice of making rainfall surveys; (4) the absence of evidence in this record distinguishing the alleged damage caused by defendant's culvert from that caused by the excessive rainfall; (5) the exhibition to the jury of the isohyetal map which was not introduced in evidence; (6) the admission of the erroneous evidence introduced on behalf of plaintiff as to the measure of damages; (7) the refusal of defendant's instruction No. 6, on the measure of damages; and (8) the refusal of defendant's instruction No. 8 bearing on the unanimity of the jury.

Inasmuch as the first, second and third grounds of error deal with the same subject matter, they will, for convenience, be considered together, and the remaining grounds will be discussed separately.

The plaintiff, in our opinion, has established from the testimony of Willis and Horn, and from the official

governmental maps and documents, that Bunnells Run in the vicinity of defendant's culvert and fill is in a general climatological area, which prior to the rainfall of June 24 and 25, 1950, was uniformly subject to sudden and heavy rainfalls, extending both within and without the drainage basin of Bunnells Run. The climatological conditions in this area were so uniform and extensive that it is quite difficult for us to see that they did not come, through the course of years, to the attention of the defendant railroad company. And while, as the learned trial Judge said during the course of the trial, the testimony and the governmental exhibits bearing on the immediate question are of little practical evidentiary value, the evidence is of such character that, if accepted by the jury, it would reasonably lead to a jury finding consonant with the purposes for which the evidence was offered by the plaintiff and admitted by the court.

Although defendant's culvert was evidently adequate when originally constructed in 1895, the evidence is, in our opinion, sufficient for the jury to find, as it did, from a preponderance thereof, that defendant's culvert was inadequate to serve the waters of Bunnells Run during the height of the flood of June 24 and 25, 1950, and on the occasions of prior floods.

From the climatological conditions generally prevailing in the West Union climatological quadrangle, and particularly in the one-ninth portion thereof, in which Bunnells Run and defendant's railroad fill and culvert are located, and from the history of Bunnells Run, embracing as it does a number of floods prior to the flood of June 24 and 25, and especially the flood of 1918, which occasioned the institution of actions against the defendant railroad company, the jury, in our opinion, had the right to find, as it evidently did under the court's instructions, that the defendant had notice that its culvert had become inadequate to serve the waters of Bunnells Run, and not having made an adequate effort to meet the changed conditions, it cannot avail itself of the defense that the damage to

plaintiff's property, resulting from the flood of June 24 and 25, 1950, was an Act of God.

In point 2 of the syllabus in the case of *Atkinson* v. *The Chesapeake and Ohio Railway Co.*, 74 W. Va. 633, 82 S. E. 502, a case strikingly in point with the instant case, this Court held: "That which reasonable human foresight, pains, and care should have prevented can not be called an act of God."

That case involved a jury finding that the defendant railway company negligently maintained an insufficient or improperly constructed culvert for the passage of water in its natural water course under its railroad fill. Recovery in that case was had on the basis that the inadequacy of the culvert caused the water to become damned and flood plaintiff's land. At page 634 of the opinion this Court said: "If the defendant had done that which reasonable care and foresight dictated it should do, plaintiffs would not have been injured even though the rain was so extraordinary that the sending of it must be considered an act of God." Thus the Court in the *Atkinson* case said indirectly what it later held, using more direct language, in the case of *Mitchell* v. *Virginian Railway Co.*, 116 W. Va. 739, pt. 3 syl., 183 S. E. 35, that is: "One obstructing a natural watercourse will not be excused unless an act of God is the sole and proximate cause of the injury * * *." In the *Mitchell* case, this Court at page 741 of the opinion said: "A railroad company, in constructing bridges, trestles or culverts over a water course must provide for such floods as may be reasonably anticipated in view of the history of the stream and the natural conditions affecting its flowage; and although the railway company may have used reasonable care in the original construction of the bridges, trestles or culverts, yet if subsequent developments prove that they are insufficient under the rule, it then becomes its duty to meet the changed conditions."

Applying the rule in *Boyce* v. *Black,* 123 W. Va. 234, pt. 1 syl., 15 S. E. 2d 588; *Fielder* v. *Service Cab Co.,* 122 W.

Va. 522, pt. 1 syl., 11 S. E. 2d 115; and kindred cases that: "Before directing a verdict in defendant's favor, every reasonable and legitimate inference favorable to the plaintiff fairly arising from the evidence, considered as a whole, should be entertained by the trial court, and those facts should be assumed as true which the jury may properly find under the evidence", we now hold that under the evidence in this record defendant's culvert was insufficient to serve the rising waters of Bunnells Run during the flood of June 24 and 25, and that the defendant should have anticipated that a flood of the magnitude of that of June 24 and 25 would occur, and, nevertheless, did not remedy the condition at its fill and culvert. Therefore, plaintiff's damages did not result from an Act of God within the holding of this Court in point 2 of the syllabus in *Atkinson* v. *The Chesapeake and Ohio Railway Co., supra.* And even if the flood of June 24 and 25 was unprecedented and of such character as to constitute an Act of God, the defendant cannot effectively defend this action on that basis, for the reason that the inadequacy of its culvert was a contributing proximate cause of plaintiff's damages. Pt. 3 syl., *Mitchell* v. *Virginian Railway Co., supra.*

Plaintiff's evidence as to the rainfall on the night and morning of June 24 and 25 at points not within the drainage basin of Bunnells Run and as to prior rainfalls not within the drainage basin of the run, admitted over defendant's objection, has, as heretofore indicated, little evidentiary value. But as this record discloses that the defendant's culvert and fill are located in a general climatological area, extending both within and without the drainage basin of Bunnells Run, which area is uniformly subject to sudden and heavy rainfalls, the evidence is admissible.

The trial court, in our opinion, did not commit reversible error in admitting the evidence as to the custom and practice of making rainfall surveys. The rainfall surveys, including the bucket surveys, portrayed by this record, have become merged in and are a part of a systematic

official governmental record. In *Carpenter* v. *Ohio River Sand and Gravel Corp.*, 134 W. Va. 587, 60 S. E. 2d 212, 216 and *Union Sand and Gravel Co.* v. *Northcott*, 102 W. Va. 519, 529, 135 S. E. 589, the official reports of the United States Army Engineers, having supervision of the height and flow of the Ohio River, were considered by this Court in determining the low water mark of that river at the two places in controversy in those cases. In *Wheeler* v. *Fidelity & Casualty Co. of N. Y.*, 298 Mo. 619, 251 S. W. 924, it was held that the records of temperature kept by officials of the United States Weather Bureau, if made originally with the intent that they be kept as a memorial to be used when required as evidence, are competent *prima facie* evidence of the facts therein stated, though made extrajudicially by persons not sworn or subject to cross-examination. In that case the Supreme Court of Missouri held that the trial court erred in holding inadmissible as hearsay a record kept by the United States Weather Bureau at Kansas City to prove the temperature at Marion, Kansas, on a particular day. In that case the Missouri Court said: "* * * It appeared that observations made at the various points in Kansas where the government had established recording stations were forwarded at the end of each month to an official of the Bureau at Topeka. This official systematized and tabulated the data contained in the reports and sent them on to the office at Kansas City, where they were further arranged and put into final form for publication. In this form they were printed for general distribution, and in this form, as printed, they are kept as the records of the United States Weather Bureau at Kansas City. Such a record is competent evidence of the facts stated in it, according to the great weight of authority."

In *Shamrock Towing Co.* v. *Cornell Steamboat Co.*, 49 F. 2d 785, the District Court of the United States for the Southern District of New York, held that the United States Weather Bureau records were the best source of information regarding the direction or velocity of wind and rainfall on the Hudson River during a particular

rain, although application thereof was said to be merely a matter of estimate. See also *Winneconne, United States* v. *Winneconne Steamship Co.*, 59 F. 2d 660; *Hufnagle* v. *Delaware & Hudson Co.*, 227 Pa. St. 476; 19 Anno. Cas. 850, note 852-854, inclusive; and for excellent summaries and collation of authorities bearing on the immediate question, see 20 Am. Jur., Evidence, Section 1032; 32 C. J. S., Evidence, Sections 546, 638, 808a. In the last-mentioned text, under note 44, Section 638a, the cases of *Handfelder* v. *East Side Levy & Sanitary District*, 194 Ill. App. 262 and *City of Madisonville* v. *Nisbet's Admr.*, 270 Ky. 248, 109 S. W. 2d 593, are cited to support the statement contained in the text that "* * * although a report, based on weather conditions too remote as to time and place, may be excluded." These two cases, though they support the text, are not applicable to the case at bar, because they contain no showing, as here, that the point immediately under investigation was in a general climatological area, where uniformly heavy rainfalls and sudden storms frequently occurred. The evidence concerning rainfall surveys by the use of buckets and other measuring devices, as well as the evidence concerning the custom relating thereto, having been merged in the official governmental records admitted in evidence, was properly admitted by the trial court.

Under the holding of this Court in *Mitchell v. Virginian Railway Co., supra,* pt. 3 syl., defendant's fourth ground of error that there is an absence in this record of evidence "distinguishing the alleged damages caused by defendant's culvert from that caused by the excessive rainfall" is without merit.

Likewise there is no error in defendant's fifth ground of error, "the exhibition to the jury of the isohyetal map, which was not introduced in evidence." A photostatic (reduced) copy of the map was introduced, as the original was not available for introduction into evidence, and the latter was exhibited to the jury because the photostatic copy was not clear. This map shows by isohyetal lines connecting places on the surface of the earth in the

vicinity of the drainage basin of Bunnells Run which have the same annual rainfall. At this point it is to be noted that Bunnells Run and the basin which it drains, are shown on both the original map exhibited to the jury and the photostatic copy thereof introduced in evidence.

Plaintiff's testimony, bearing on the measure of damages to his residence property, is inconsistent in that on direct examination plaintiff testified, over objection, that he suffered damages to the foundation, floor and walls of his residence property in the amount of the difference between the fair market value of the property before the flood and the fair market value thereof after the flood, "considering the damage to the residence building and to the foundation, floor and walls thereof occasioned by the flood". On being recalled to testify in his own behalf, he testified, without objection, that "The fair cost of the required materials and labor to repair the injury occasioned to the foundation, floor and walls" of his residence by the flood of June 24 and 25, 1950, "and of restoring such foundation, floor and walls to their respective conditions immediately before the flood", had plaintiff undertaken the work of repair immediately after the flood or as soon thereafter as the necessary materials could be obtained, was $500.00.

In the case law of this State the distinction between permanent damages and temporary damages is quite clear. Only where the cause of the injury to real property is fixed and indeterminable, so that the property must always remain subject to the damages, are the damages permanent, in which case there can be but one recovery. The test whether damages to real estate are permanent or temporary is whether the act producing the injury is productive of all of the damage which can result from the injury, and no further damage can ensue, or whether the injury is intermittent and occasional, or the cause thereof capable of being remedied, removed or abated. In the former case the damages are permanent and in the latter case the damages are temporary. *Norfolk and Western Railway Co.* v. *Allen,* 118 Va. 428, 87 S. E. 558;

*Henry* v. *Ohio River Railroad Co.*, 40 W. Va. 234, 21 S. E. 863.

If plaintiff's damages were permanent, his testimony on direct examination was based upon the correct measure of damages. But if plaintiff suffered only temporary damages to his residence property, the testimony which he gave on being recalled in his own behalf, bearing as it does on the cost of the repairs, was based upon the correct measure of damages, in which event recovery can be had only on the basis of the reasonable cost of repairing the residence property so as to restore it to its condition immediately before the flood. *Rogers* v. *Coal River Boom & Driving Co.*, 39 W. Va. 272, 19 S. E. 401; *Henry* v. *Ohio River Railroad Co. supra; Pickens* v. *Boom and Timber Co.*, 66 W. Va. 10, 65 S. E. 865. In point 5 of the syllabus in *Oresta* v. *Romano Bros.*, 137 W. Va. 633, the Court held that damages to real estate which are occasional, intermittent, and recurrent are temporary.

In the valuation of personal property, which has been damaged but not destroyed, the measure of damages is the difference between the market value of the property immediately before and immediately after the property was damaged, plus necessary and reasonable expenses incurred by the owner in connection with the injury. Pt. 7 syl., *Cato* v. *Silling*, 137 W. Va. 694; *Biederman, Inc.* v. *Henderson,* 115 W. Va. 374, 176 S. E. 433. An exception to this rule is that where tangible personal property can be restored by repairs and the repairs would be less than the diminution in value because of the injury, the amount recoverable is the reasonable cost of restoring the property to its former condition. 25 C. J. S., Damages 83; pt. 7 syl., *Cato* v. *Silling, supra.*

Bearing on the inconsistency, apparent or real, of plaintiff's testimony as to the damages to his real property, the case of *McHenry* v. *City of Parkersburg*, 66 W. Va. 533, 66 S. E. 750, is strikingly similar to the instant case, but does it control this case? In the *McHenry* case plaintiff obtained a judgment for seven hundred and fifty dollars

against the City of Parkersburg as damages for the collection of surface water from the city's sewer system and the casting of water in bulk upon her lot. In that case witnesses for plaintiff testified, without objection, that five years before the institution of plaintiff's action the property was worth from fifteen hundred to twenty-five hundred dollars; likewise without objection these witnesses were permitted to testify that at the time the action was instituted plaintiff's property was worthless; and plaintiff's husband and one other witness testified, without objection, that it would take nine hundred dollars "to restore the property to its former condition." These witnesses, however, did not state what this cost of nine hundred dollars would include, except that the testimony dealt with the previous detailing of the extent of the injury and the cause thereof. In the *McHenry* case this Court held in point 2 of the syllabus that the evidence as to the difference between the value of the property before it was damaged and the value thereafter was inadmissible, and in point 3 of the syllabus the Court, dealing with the testimony of plaintiff's husband and the other witness, who testified that it would take nine hundred dollars to restore the property to its former condition, held: "A verdict in such an action, predicated partially upon evidence going beyond the true measure of damages and tending to prove the cost of altering the condition of the property so as to abate the cause of injury or render the property immune from its operation, in addition to the true elements of damages, the cost of repairing the injury to the property, reimbursement for expenses, directly occasioned by the flooding of the property, and compensation for loss of use of the property and rentals, destruction of, and damages to, personal property, and the like, should be set aside on motion, although the evidence was admitted without objection."

In the *McHenry* case the Court held that the testimony to the effect that it would take nine hundred dollars to restore the property to its former condition was too indefinite on which to predicate a verdict, in that the testimony

"did not indicate what this cost would include", and in its opinion posed the inquiry: "Did this include the cost of putting a sewer through the lot to carry the water away, or of filling the lot so as to divert the water from it, in addition to the cost of repairing the building and loss of, and injury to, carpets and furniture, and deprivation of use and rents?", to which Judge Poffenbarger in the majority opinion, replied: "No juror could say nor can we." So as the Court viewed the record in the *McHenry* case there was no competent evidence of damages upon which the jury could have based its verdict.

In the instant case the jury found that plaintiff suffered damages to his residence property in the amount of $500.00, and plaintiff's testimony as to the difference between the value of the property before and after the flood, "considering the damage to the residence building and to the foundation, floor and walls thereof occasioned" by the flood, was in like amount of $500.00. On being recalled plaintiff, unlike the plaintiff in the *McHenry* case, testified specifically that "the fair cost of the required materials and labor to repair the injury occasioned to the foundation, floor and walls of [his] residence" and "of restoring such foundation, floor and walls to their respective conditions immediately before the flood" was also $500.00. So in the instant case there was competent evidence upon which the jury could base its finding that the cost of repairing the residence was $500.00. In view of the fact that plaintiff's testimony on direct examination and that which he gave on being recalled elicited from him the estimate of $500.00 damages to his residence, the amount declared on in the declaration, and the amount embraced in the jury verdict, the error of the trial court in permitting plaintiff to testify, over objection, as to the difference in the value of the entire property before and after the flood, "considering the damage to the residence building and to the foundation, floor and walls thereof occasioned" by the flood was not, in our opinion, prejudicial.

At the conclusion of the evidence the defendant offered

and the court refused to give, defendant's instruction No. 6, the only instruction offered bearing on the measure of damages. This instruction reads: "If the jury believe from a preponderance of the evidence in this case that the plaintiff is entitled to recover for the alleged injury or damage to his property described in the declaration, the measure of the damages to the foundation, floor and walls of his residence, and to his outhouse, would be the cost of the necessary material and labor to restore the said residence and outhouse to their conditions immediately before the alleged injury or damage; and the measure of the alleged damage to his personal property would be the difference between the fair market value thereof immediately before the alleged injury or damage thereto and the fair market value thereof immediately after the alleged injury or damage. And the burden is on the plaintiff to prove such damages to the satisfaction of the jury by a preponderance of the evidence, and in ascertaining the value of said properties before the alleged injury or damage thereto, as claimed by the plaintiff, the jury may consider the assessed value of said properties on January 1, 1950, as shown in evidence."

Certainly, defendant was entitled to an instruction informing the jury which of the two theories of the measure of damages set forth in plaintiff's testimony should be the basis of its verdict. *Danielley* v. *Virginian Railway Co.*, pt. 5 syl., 103 W. Va. 97, 136 S. E. 691. The damages to plaintiff's residence being temporary, under the rulings of this Court in the cases of *Rogers* v. *Coal River Boom & Driving Co., supra; Henry* v. *Ohio River Railroad Co., supra; Pickens* v. *Coal River Boom & Timber Co., supra;* and *Oresta* v. *Romano Bros., supra,* defendant's instruction No. 6 correctly told the jury that if they should find for the plaintiff, they should assess the damages to the foundation, floor and walls of plaintiff's residence and to his outhouse in such amount as "would be the cost of the necessary material and labor to restore the said residence and outhouse to their condition immediately before the alleged injury or damage." This instruction

further told the jury that in ascertaining the value of plaintiff's property before it was damaged, it "may consider the assessed value of said properties on January 1, 1950, as shown in evidence." The instruction was properly refused by the trial court for two reasons: (1) Since the omission from Code, 11-3, of Chapter 29, Section 115, Barnes' Code, 1923, providing in part that "In any proceeding * * * wherein the value * * * of any such property or any part thereof may come in question, the assessment of such property appearing on the land or personal property books, last certified before the beginning of such proceedings, shall be admissible, together with other evidence, to ascertain the value of such property.", the assessed value of property is not evidence of its value for other than taxation purposes; and (2) the instruction gives to the assessment value of the property undue prominence on the question of the ascertainment of the actual value.

As to the omission of Chapter 29, Section 115, Barnes' Code, from the Official Code of 1931, this Court in *Day* v. *Adkins,* 112 W. Va. 322, 164 S. E. 238, which involved an action to recover damages for breach of a contract to convey real estate, held that the trial court did not commit reversible error in excluding evidence as to the assessed value of the property; and the second ground which justified the trial court in refusing to give the instruction is based upon the rule well established in this State that it is error to give an instruction which singles out certain matters contained in the evidence and gives undue prominence thereto to the exclusion of other evidence. *Bragg* v. *C. I. Whitten Transfer Co.,* 125 W. Va. 722, 26 S. E. 2d 217; *Cain* v. *Kanawha Traction & Electric Co.,* 85 W. Va. 434, 102 S. E. 119; *Parkersburg National Bank* v. *Hannaman,* 63 W. Va. 358, 60 S. E. 242; and *Bice* v. *Wheeling Electric Co.,* 62 W. Va. 685, 59 S. E. 626.

And, finally, error is assigned to the court's refusal to give defendant's instruction No. 8, bearing on the unanimity of the jury. This instruction was skillfully drafted by defendant's counsel. It correctly instructed the jury

that the verdict should be unanimous without inviting obduracy or disagreement on the part of the jury. If the trial court had given the instruction, as drafted, its action in that regard would not have been reversible error, nor, under the present holding of this Court, would its refusal thereof constitute reversible error. In the case of *Robertson* v. *Hobson,* 114 W. Va. 236, syl. 1, 171 S. E. 745, which remains in the case law of this State not overruled, this Court inferentially limited the holding of the Court in pt. 2 syl., to *Emery* v. *Monongahela West Penn Public Service Co.,* 111 W. Va. 699, 163 S. E. 620, in the following language: "Such an instruction [on unanimity of the jury verdict] embodies principles so generally understood by jurors and so fully covered by the oath of the juror, that refusal to give the instruction would rarely, if ever, constitute prejudicial error." The holding of this Court in the *Robertson* case is specifically based upon the case of *Brogan* v. *Union Traction Co.,* 76 W. Va. 698, 86 S. E. 753. In referring to the last-mentioned case, this Court in the *Robertson* case said at pages 242-243 of the opinion: "But as was said by this Court in *Brogan* v. [*Union*] *Traction Co.,* 76 W. Va. 698, 707, 86 S. E. 753, Jurors generally understand that their verdict must be unanimous. We cannot conceive that the defendant was prejudiced because he failed to have the jury specially instructed to that effect." And at page 243 of the opinion this Court adopted the language of the Supreme Court of Appeals of Virginia in *Sims* v. *Commonwealth,* 134 Va. 736, 115 S. E. 382: " 'The instruction [that bearing on unanimity] might probably have been given with propriety, but it embodied principles so well understood and so fully covered by the oath of each juror, that its refusal could not be deemed error.' "

The trial court, in our opinion, did not err in refusing to give defendant's instruction No. 8, and the fact that the jury was properly and fully instructed as to the burden of proof and the preponderance of the evidence, fortifies us in this position.

There being, in our opinion, no prejudicial error in this

record, the judgment of the Circuit Court of Ritchie County is affirmed.

*Affirmed.*

LOVINS, JUDGE, dissenting:

The facts shown in the record in this case and applicable law are probably sufficient to justify a recovery by the plaintiff; were it not for erroneous rulings during the course of the trial.

Specifically, my disagreement with the opinion of the court rests on two propositions: (1) The admission of testimony relative to the difference in market value of plaintiff's real estate before and after it was flooded. (2) The refusal to give Instruction Number 8 tendered by defendant.

Before discussing the two specific propositions above stated, I advert to the testimony introduced by plaintiff relative to the amount of rainfall on Bunnells Run as indicated by a "bucket survey". The testimony of witnesses who relied on the bucket survey clearly indicates that a great part of their testimony is founded on hearsay. One of the answers of one of the witnesses is typical: "Inquiry is made as to their knowledge [residents] of the amount of rainfall that occurred in buckets or any container that may be measured and computed the depth of the rainfall". It is shown that information was obtained at six points in the West Union Quadrangle. Testimony as to the amount of rain at certain points, marked on a map which was before the jury, shows that the data was accumulated at those points and was based on conditions as observed by persons not present before the court nor subject to cross examination. In justice to the witness, it may be said that it was their official duty to collect such data. I cannot however, escape the conclusion that the witness' testimony as to the amount of rainfall in the drainage basin of Bunnells Run, occurring on the 24th and 25th days of June, 1950, was founded on data which is more or less inaccurate, but that such survey, being

a part of a system of collecting rainfall data, should have been admitted and considered. Notwithstanding the criticism here made, with reference to the type of testimony, as to the amount of rainfall, I would not reverse the judgment in the instant case solely for that reason.

It seems to me that the testimony was not relevant, pertinent nor material to establish liability on the part of the defendant, and had little probative value. But since the jury, and not the court, is the judge of the weight of testimony, it was not error to admit such testimony.

It is true that in the case of *Carpenter v. Ohio R. S. & G. Corp.,* 134 W. Va. 587, 60 S. E. 2d 212, hydrographic charts made by employees or officials of the United States Government were admitted to show the location of the low water mark of the Ohio River. But there is a wide difference between hydrographic charts made after many years of observing and measuring the stages of the Ohio River and a survey made as the one in the instant case for the purpose of ascertaining the amount of one rainfall. Especially is this true when a report is founded on the observation and measurement of persons under no official duty to do so. There is too great an opportunity for error, inconsistency and faulty observation of the persons on whom the verity of the report ultimately depended.

Official reports kept as required by statute in the discharge of a public duty are admissible in evidence. Evanston v. Gunn, 99 U. S. 660, 25 Law Edition 306. But well grounded principles of the law of evidence established as the result of much thought by lawyers and judges of bygone days, should not be violated in the admission of such reports. So far as I have been able to ascertain, no court has gone so far as to admit in evidence any more than an official report *per se.*

The admission, over the objection of the defendant, of testimony relative to the difference in market value of plaintiff's real estate before and after it was flooded, is clearly error. In the case of *McHenry v. Parkersburg,*

66 W. Va. 533, 66 S. E. 750, it was held that the injury to the real property covered in that case, was temporary and that only temporary damages could be recovered. It was further held in the McHenry case that in an action for recovery for temporary damages, that it was error to admit testimony relative to the difference between market value of the property before it was subjected to the injury and its market value after such injury; that such testimony was inadmissible and if admitted without objection, a verdict based thereon should be set aside. *Oresta* v. *Romano Brothers,* 137 W. Va. 633, 73 S. E. 2d 622; *Flanagan* v. *Gregory & Poole, Inc.,* 136 W. Va. 554, 67 S. E. 2d 865. See *Mason* v. *Bluefield,* 105 W. Va. 209, 141 S. E. 782.

As to the distinction between facts which permit a recovery of temporary damages and those allowing recovery of permanent damages, see *Henry* v. *Ohio River R. Co.,* 40 W. Va. 234, 21 S. E. 863; *Guinn* v. *Railroad Co.,* 46 W. Va. 151, 33 S. E. 87; *Eells* v. *Railway Co.,* 49 W. Va. 65, 38 S. E. 479; *Bartlett* v. *Chemical Co.,* 92 W. Va. 445, 115 S. E. 451. As to the general rule relative to the measure of damages for temporary injury, see Annotation 87 A. L. R., page 1384, *et seq.*

"Admission of illegal evidence over objection is presumptively prejudicial and where it does not clearly appear that a verdict against the party objecting was unaffected thereby, a judgment rendered thereon should be reversed and the verdict set aside." *Slater* v. *Gas Co.,* 126 W. Va. 127, 27 S. E. 2d 436; *Mitchell* v. *Insurance Co.,* 124 W. Va. 20, 30, 18 S. E. 2d 803. See *Alford* v. *Railroad Co.,* 84 W. Va. 570, 100 S. E. 402; *Ewers* v. *Montgomery,* 68 W. Va. 453, 69 S. E. 907 and Vol. I, Michie's Digest, page 458, where numerous cases are cited. But it is not however always grounds for reversal if "it clearly appears from the whole case, including the court's instructions to the jury, that it could not have produced a different result, and had it been excluded the result would have been the same," *Hubbard* v. *Assurance Society,* 88 W. Va. 361, 106 S. E. 786. But if it is doubtful whether the admission of illegal evidence is prejudicial or otherwise,

such error is sufficient cause for reversal of a judgment. *Taylor* v. *Baltimore & O. R. Co.*, 33 W. Va. 39, 10 S. E. 29. See *Neeley* v. *Town of Cameron*, 71 W. Va. 144, 75 S. E. 113 for elaboration of the rule that the admission of illegal testimony is harmless error.

In the instant case, I know of no means by which a reasonably, clear conclusion can be reached that the admission of testimony relative to the difference in market value of plaintiff's real estate did not prejudice the defendant. From the consideration of such testimony, the jury may have inferred from the testimony relating to the permanent injury of plaintiff's real estate that the injury was permanent and lasting and could not be repaired. Certainly, there is proper proof in this record as to the cost of repairs of damages to plaintiff's real estate, but I do not believe that the admission of that testimony cured the error theretofore committed by the trial court in admitting testimony of the difference in market value.

The plaintiff tendered and the court refused the following instructions: "Upon the trial of Jury cases, such as the present one, our law contemplates and requires the concurrence or agreement of the minds of twelve jurors before a verdict can be rendered for the plaintiff, and while the jury room is no place for pride of opinion or stubbornness, and it is the duty of jurors to discuss and consider the evidence in a spirit of fairness and candor, and agree upon a verdict, if they can do so without the sacrifice of a conscientious opinion or belief, arising from the law and the evidence, yet each juror should feel the responsibility resting upon him as a member of the jury, and should realize that his own mind must be convinced by a preponderance of the evidence before he can agree to a verdict in favor of the plaintiff; and if any individual juror in this case, after he has duly and impartially considered all the evidence, the Instructions of the Court, the Arguments of Counsel, and, in a spirit of fairness and candor, consulted with his fellow jurors, is not convinced, under his oath, that the plaintiff, Collie T. Riddle, has proved the material allegations of his Declaration, by a

preponderance of the evidence, such juror should not agree to a verdict in favor of said plaintiff, for any sum of money, even though some or all of the other jurors be of a different opinion." The instruction just quoted was not covered by any other instruction given the jury.

An examination of this instruction and pertinent cases decided by this court discloses that such instruction has been approved in this jurisdiction. *State* v. *McKinney,* 88 W. Va. 400, 106 S. E. 894, the 7th point of the syllabus is as follows: "An instruction on the subject of the legal requirement of unanimity of the jury in the finding of a verdict, which, if given, would advise the jury that, if any juror, after due consideration of the evidence and consultation with his fellows, has reasonable doubt of the guilt of the accused in a criminal case, it is his duty not to surrender his own convictions, simply because the other jurors are of a different opinion, is correct, and should be given upon request, unless its subject is covered by some other instruction given in the case." *State* v. *Edgell,* 94 W. Va. 198, 118 S. E. 144; *State* v. *Noble,* 96 W. Va. 432, 123 S. E. 237; *State* v. *Warrick,* 96 W. Va. 722, 123 S. E. 799; *State* v. *Joseph,* 100 W. Va. 213, 130 S. E. 451.

This court seems to have drawn no distinction between criminal and civil cases. The holdings of this court as then constituted, are set forth in the case of *Emery* v. *Monongahela,* 111 W. Va. 699, 163 S. E. 620, in the second point of the syllabus. In the case of *Robertson* v. *Hobson,* 114 W. Va. 236, 171 S. E. 745, the second point of the syllabus, *Emery* v. *Monongahela, supra,* was disapproved on the ground that it was incomplete. Subsequent to *Robertson* v. *Hobson, supra,* this court considered the case of *State* v. *Manstoff,* 118 W. Va. 214, 189 S. E. 698, where the authorities are collated and discussed. The court, in the Manstoff case, justified the refusal of instruction as to the unanimity of the verdict of a jury, on the ground that it was covered by another instruction relating to that subject, and given. Though a jury verdict must be unanimous under the rule of common law, an instruction which invites disagreement of a jury should be refused.

*State* v. *Sibert,* 113 W. Va. 717, 169 S. E. 410. If the requirement of unanimity is embraced in an instruction containing another statement of a legal principle which is erroneous, it should likewise be refused. *State* v. *Zink,* 98 W. Va. 340, 128 S. E. 114. Generally, as to the requirement of giving an instruction such as here considered, see Annotation 137 A. L. R., page 394.

It has long been established law in this jurisdiction that it is the duty of a trial court to give a tendered instruction which correctly states the law and is supported by appreciable evidence. *Vinal* v. *Core and Compton,* 18 W. Va. 1. See *Grace* v. *Smith,* 106 W. Va. 711, 146 S. E. 879, *State* v. *Fletcher,* 106 W. Va. 601, 146 S. E. 628. Nor is the weakness of evidence legal ground for refusal. *Foster* v. *Brennan,* 113 W. Va. 122, 166 S. E. 845. See *Slater* v. *Gas Co., supra, State* v. *Gunter,* 123 W. Va. 569, 17 S. E. 2d 46.

The first point of the syllabus in *Robertson* v. *Hobson, supra,* reading as follows: "An instruction on the unanimity of the jury is ordinarily given as a matter of course. But such an instruction embodies principles so generally understood by jurors and so fully covered by the oath of the juror, that refusal to give the instruction would rarely, if ever, constitute prejudicial error." Inherrent in the language of that syllabus point just quoted, is the fact that a question of law is submitted to a jury.

It is my understanding that the common law of this state, under Article VIII, Section 21, of the State Constitution, prevails in this jurisdiction until it is changed by statute. I know of no statute which has altered the common law, with respect to unanimity of a jury verdict. Nor do I know of a statute or legal principle permitting the submission of a question of law to a jury.

It seems to me that it would be illogical to say that a proper instruction, supported by evidence, may be refused by a trial court, though not covered by any other instruction, without committing error. A litigant is either entitled to an instruction or a charge, or he is not entitled thereto. I think to vest discretion in the trial court, which

in effect the court's opinion has done, reads into the law of this state a new and strange principle and if such principle should be extended to its ultimate limits, we would reach the point where the giving of any instruction or charge would be discretionary.

Of course it is frequently argued that the giving and refusing of instructions and charges to a jury are a prolific source of error. It is a consumation to be wished that errors and opportunities for error in litigation should be eliminated. Nevertheless, so long as our system of jurisprudence requires the ascertainment, and finding of fact by a body of laymen called a jury and an authoritative statement of law by the presiding officer of a court called a judge, I see no opportunity to eliminate the giving of instructions or charges to juries. I think that an instruction to the jury, on the unanimity of its verdict, even giving the case of *Robertson* v. *Hobson, supra,* full force and effect, is required in this jurisdiction and that when such instruction is properly drawn, it is error to refuse it.

I am authorized to say that Judge Haymond joins in the views herein expressed as to the erroneous admission of testimony concerning the difference in market value of plaintiff's real estate before and after the flood. But he does not agree, or join in that part of this dissent relating to the "bucket survey", and the refusal of defendant's instruction number 8.

For the two reasons herein discussed, I would reverse the Circuit Court of Ritchie County. Judge Haymond would reverse for the reason that the testimony relative to market value of plaintiff's real estate was improperly admitted.