Petition of READING CO. (two cases).

THE PATIENCE.

THE WYOMISSING.

United States District Court,
S. D. New York.
May 26, 1954.

Macklin, Speer, Hanan & McKernan, New York City, for petitioner. Leo F. Hanan, New York City, of counsel.

Hagen & Eidenbach, New York City, for Premium Coal Co., Inc., M. & J. Tracy, Inc. and Segrave Transportation Co., Inc. Henry C. Eidenbach and John F. Quarto, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Burns Bros. Raymond T. Greene and Stephen Buckley, New York City, of counsel.

Hill, Rivkins & Middleton, New York City, for Vijax Coal & Oil Corp. Allan B. Lutz, New York City, of counsel.

McGOHEY, District Judge.

In a proceeding by Reading Co., as owner of the Steamtug Patience and Steamtug Wyomissing for exoneration from or limitation of liability arising out of sinking of coal barges James J. Kelly, Highball, Cape Neddick and Gardner Pattison, petitioner's right to limit liability has been conceded by the following claimants:

1. M. & J. Tracy, Inc. as owner of the barge Cape Neddick and bailee of cargo thereon.

2. Segrave Transportation Co., Inc. as owner of barge James J. Kelly, and barge Highball.

3. Burns Bros. as owner of barge Gardner Pattison and cargo thereon.

4. Premium Coal Co. as owner of cargo aboard James J. Kelly.

5. Vijax Coal and Oil Corp. as owner of cargo aboard barge Highball.

The facts found are as follows:

1. Reading Company is a Pennsylvania corporation and owner of the Steamtugs Patience and Wyomissing.

2. M. & J. Tracy, Inc. is a New York corporation and the owner of the barge Cape Neddick and bailee of the cargo laden thereon.

3. Segrave Transportation Co., Inc. is a New York corporation and was the owner of the barges James J. Kelly and Highball.

4. Burns Bros. is a New York corporation and was the owner of the barge Garner Pattison and cargo laden thereon.

5. Vijax Coal & Oil Corporation is a New York corporation and the owner of the cargo laden aboard the barge Highball.

6. Premium Coal Co., Inc. is a New York corporation and the owner of the cargo laden on the barge James J. Kelly.

7. The tug Patience is a steamtug of approximately 198 net tons, having a length of 122.3 feet, breadth of 25 feet, depth of 14 feet and 500 horse power.

8. The tug Wyomissing is a steamtug of approximately 151 net tons, having a length of 104 feet, breadth of 24 feet, a depth of 11 feet and 500 horse power.

9. On November 24, 1950 at about 4:30 P.M., the tug Wyomissing left Port Reading, N. J. with the loaded coal barges James J. Kelly, Gardner Pattison, Cape Neddick, Cape Kearney, Cape Walker and Highball in tow, bound for New York Harbor.

10. The tug Patience joined the tow as helper tug and at about 6:30 P.M. took the barge Cape Kearney out of the tow and landed her at Howland Hook, N. J. The Patience then rejoined the tow which proceeded without incident to the Reading Company stakeboat in New York Bay.

11. The Reading Company stakeboat was, on November 24 and 25, 1950, located in a Government anchorage area about 1200 feet in a general easterly direction from the pier at Bedloe's Island. The stakeboat is 70 feet long, 30 feet wide, with a low freeboard. It was held in position by steel chains approximately 500 feet in length.

12. The tow arrived at the stakeboat at about 9:30 P.M. on November 24, 1950. The tug Wyomissing, after hauling in her towing cables, took the barge Cape Walker out of the tow and delivered it to 59th Street, North River. The tug Patience secured the tow to the stakeboat with four 6 inch lines approximately 20–25 feet in length. Two of these lines were made fast to the barge Highball and two were made fast to the barge James J. Kelly. The tow was made fast

to the stakeboat in two tiers. The Highball was the port boat in the first tier and the James J. Kelly was the starboard boat in the first tier. The Gardner Pattison and Cape Neddick were port and starboard boats, respectively, in the second tier.

13. There was no stakeboat captain aboard the Reading stakeboat that night, although customarily and usually there is one there. He was off for the Thanksgiving holiday. A deck hand from the tug Patience had to go aboard the stakeboat and handle the lines.

14. The Pennsylvania Railroad stakeboat in New York Harbor had a captain on board during this period.

15. There were no radio telephones aboard either the tug Patience or the tug Wyomissing. The Reading Company owned four tugs on November 24–25, 1950.

16. The Reading Company's dispatcher's office was not open on a twenty-four hour basis in 1950.

17. The tug Patience, after securing the tow to the stakeboat went to Johnson Avenue, Jersey City, for orders. At that place she received orders to go to 96th Street, East River. The four boats that were left at the stakeboat were to be delivered to places in the East River. The tug Wyomissing had received orders before leaving Port Reading, New Jersey, to tow these boats to their destinations in the East River. These boats were moored at the stakeboat to await favorable weather conditions pursuant to a practice that had been found safe and proper after many years of experience by petitioner and other companies.

18. It was high water at the Battery at 8:16 P.M. The flood current continues to run in both the North and East Rivers for some time after high water at the Battery, running longer in the North River than in the East River. Therefore, when the barges were moored at the Reading Company stakeboat between 9:30 and 9:45 on November 24, 1950, there was not sufficient flood current remaining to enable the Wyomis-

sing to tow the barges to their East River destinations.

19. The long-standing practice of the Reading Company was to leave boats bound in and out of the East and North Rivers at the stakeboat to await the first available flood current.

20. Low water at the Battery was predicted to occur at 2:22 A.M. on November 25, 1950. The ebb current in the North and East Rivers runs for some time after the occurrence of low water, running longer out of the North River than the East River. Pursuant to practice of Reading Company, boats bound into the East River would be towed away from the stakeboat about one and a half hours after low water. Thus the tug Wyomissing would start to tow the four boats moored to Reading Company stakeboat to their East River destinations at about 4:00 A.M. on November 25, 1950.

21. At 11:00 P.M. on November 24, 1950, a southeast storm warning signal was displayed by the U. S. Weather Bureau on top of the Whitehall Building.

22. The Wyomissing returned to petitioner's order box at Johnson Avenue, Jersey City after delivering the Cape Walker at 59th Street and, finding no orders, remained there until time of approximately low water and then went to the stakeboat, arriving there about 2:45 A.M.

23. At the time the warning was hoisted the wind was light from the East, but by 3:00 A.M. the wind and seas had increased to such an extent as to necessitate the tug Wyomissing, which was moored to the stakeboat, to cast off in order to prevent possibility of sinking the stakeboat or damaging the tug.

24. At about 3:00 A.M. the tug Patience had reached a point above Caven Point in the Upper Bay on her voyage to Port Reading with the tow of light barges she had picked up at 96th Street in the East River. Because of the severe increase of the wind and seas she turned about and sought refuge at Pier 6 North

River. She had arrived there at about 4:30 A.M. and put a line out to the pier with her tow still astern so as to have the tow ride out the heavy weather.

25. As the Patience approached Pier 6 her master for the first time observed the storm signal. The Patience was ordered to leave Pier 6 by the pier watchman. The Patience finally found room in the slip at Pier 10 to moor her tow, which she was successful in doing at about 8:00 A.M. on November 25, 1950. She went for supplies and then went to the Reading Company stakeboat, arriving there at about 9:00 A.M.

26. The tug Wyomissing had been standing by the barges moored at the stakeboat from 2:45 A.M. Because of the weather and tidal conditions, the master of the tug Wyomissing, who at the time of trial had deceased, apparently decided not to attempt to move the loaded coal barges from the stakeboat, either singly or otherwise. At about 5:00 A.M. one of the four lines between the stakeboat and loaded tow parted. This line was replaced. The Wyomissing also put a line out to the barge Cape Neddick, which was the starboard boat in the second tier, in order to be in a position to render immediate assistance. At about 8:00 A.M. on the 25th the wife of the captain of the barge Highball was removed by those aboard the Wyomissing. At about 10:00 A.M. a second line between the stakeboat and the tow parted and a third was starting to chafe. These lines were replaced by the Wyomissing's crew.

27. By this time all the barges were taking water because the weather had reached gale proportions. The barge captains did not use their pumps and it was impossible because of the weather to put syphons from the tug into the barges.

28. Between 10:30 and 11:00 A.M. on the 25th, the captain of the Wyomissing ordered all the barge personnel off their barges and aboard the tug because he believed the barges in a sinking condition. At about 12:30 P.M. on the 25th,

the barge James J. Kelly sank and parted the lines running between her, the stakeboat, the barges Highball and Cape Neddick. The Patience was standing by at this time as the Wyomissing had proceeded into Pier 18 to deliver the personnel from the barges, one of whose number was ill and unable to remain aboard the tug.

29. Shortly after the James J. Kelly had sunk, the barge Cape Neddick broke adrift and subsequently sank.

30. Shortly before 2:00 P.M. on the 25th, the barge Gardner Pattison broke adrift and went on the rocks at Bedloe's Island. At about 3:30 P.M. the barge Highball sank. The Wyomissing had returned to the stakeboat after having landed the barge personnel.

31. The storm continued with great severity until about 6:30 P.M. on November 25, 1950, when it suddenly abated.

32. The Pennsylvania Railroad operated a stakeboat approximately 2,000 feet in a general Northerly direction from Reading Company's stakeboat. That stakeboat was larger than the Reading Company's, and with a higher freeboard. A tow was moored at the Pennsylvania stakeboat by Pennsylvania tugs at 11:05 P.M. on November 24, 1950. The Pennsylvania tow was left unattended until about 3:50 A.M. on November 25th, when the tug Elmira arrived in order to stand by the barges moored there. At about 4:40 A.M. the tug Linden arrived to stand by also. It was the opinion of the master of the Elmira that it was impossible to move any of the barges moored at the stakeboat at any time after he arrived there at 3:50 A.M. until the storm finally abated.

33. The storm which occurred from the early morning to late evening of November 25, 1950 was one of the worst ever experienced in the New York area.

34. The Reading Company's tug masters, although having actual or constructive notice of the southeast storm warning signal hoisted on top of the

Whitehall Building, relied also on their judgment and experience. No attempt was made to seek additional weather information.

■ The pertinent inquiry is whether the facts as found show negligence on the part of the tugs Patience and Wyomissing. The contract of towage does not subject the tug to absolute liability, and it is only by showing negligence that claimants here can prevail.[1] It seems clear from the testimony that tying the barges to the stakeboat in the first instance was not negligent. Negligence then must be found in some subsequent act or omission of the petitioner's vessels causally connected with the injury to the barges. The physical cause of the damage to the barges was a severe weather disturbance and the resulting winds and high seas. If there is any negligent act or omission it must appear in connection with these conditions. It is not enough simply to show damage in order to place the burden on petitioner of showing inevitable accident. Claimants must first show some negligence or circumstances from which negligence can be inferred before there is any burden on the petitioner to explain or excuse its conduct.

At best, claimants have shown only that the barges were left unattended at the stakeboat from 9:30 to about 2:45; that a S. E. storm warning was hoisted at 11:00 P.M., that the barges were not removed from the stakeboat and subsequently were sunk by the wind and waves. The claimants contend "that the tugs Wyomissing and Patience were at fault for disregarding the storm warning displayed after 11:00 P.M. on November 24, 1950, for failing to shift the barges from the stakeboat on the early morning of November 25, 1950, before the storm reached its maximum intensity, and for failing to make proper use of the tugs so as to shield the barges and ease the strain on the stakeboat during the height of the storm."

■ It is true that the masters are chargeable with knowledge of the storm warning[2] but from the testimony of all the masters—interested and disinterested witnesses alike—it appears that sound seamanship would require of them no more than they did, even had they had such knowledge.[3] Had they contacted the Weather Bureau before 5:00 A.M. they would have learned nothing to add to what was already known. And on the basis of what was known, viz. that a S. E. storm was brewing, the witnesses all testified that the stakeboat was a safe place to leave the barges.

■ Apparently by the time the Wyomissing returned to the stakeboat, the weather conditions were such that it was unsafe to move the barges, but nowhere does it appear that, had the Wyomissing returned sooner, the proper course would have been to move them. All of the acts of the tug masters were predicated on their judgment that in a storm the stakeboat was a safe place for the barges, and from the information they had or could have had nothing appears to conflict with that determination. That their determination was wrong in view of the unlooked for intensity of the storm is not enough to charge them with negligence.[4] Nor do I think it has been shown that the tugs were negligent in not doing more to shield the barges or protect the stakeboat. The tugs did all it was thought possible to do under the circumstances. The mere fact that a different tug lashed itself to a different stakeboat does not charge this petitioner with negligence for not doing likewise where a different set of circumstances existed.

1. Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

2. Nicholson v. Erie R. Co., 2 Cir., 1918, 255 F. 54.

3. Bouchard Transportation Co., Inc., v. Pennsylvania R. Co., 2 Cir., 1925, 6 F. 2d 362; The Golden Rule, 1925 A.M.C. 297, affirmed, 2 Cir., 1922, 278 F. 1021.

4. The Perseverance, D.C.S.D.N.Y.1930, 49 F.2d 785; The Mary T. Tracy, D.C. S.D.N.Y.1920, 298 F. 528, 530, reversed on other grounds, 2 Cir., 1925, 8 F.2d 591.

Therefore there was no negligence in mooring the barges at the stakeboat originally, nor in not moving them later even though in retrospect this may have been an error of judgment. Failure to observe the storm warnings and to seek further information, although presumptively negligent, could not have contributed to the damage since no further information could have been obtained at a time when it would have been possible to move the barges, and even had the only information available been conveyed to the masters, they would have considered leaving the barges at the stakeboat the proper course and therefore would have acted no differently than they did. When it became apparent that an unusual weather condition existed it was already too late to remove the barges. From this time on the tugs' crews did everything called for by good seamanship, and in the case of removing the barge personnel even exposed themselves to extra-hazardous conditions. No negligence has been shown and petitioner is entitled to exoneration.

Submit proposed decree.