**Josephine RICE, as Executrix of the Estate of Philip Rice, Libelant,**

v.

**CORNELL STEAMBOAT COMPANY, Respondent.**

**No. 19899.**

United States District Court
E. D. New York.

July 2, 1957.

Mahar & Mason, New York City, by Frank C. Mason, New York City, for libelant.

Thacher, Proffitt, Prizer, Crawley & Wood, New York City, by Edward C. Kalaidjian, and Robert S. Stitt, New York City, for respondent.

BYERS, District Judge.

The libelant's cause is for substantial damage to the scow Elizabeth R sustained on November 25, 1950, in Haverstraw Bay, in that part called the Basin, where the New York Trap Rock's Long Cove Quarry was operated.

The precise claim against respondent, as pleaded, is that the latter was negligent in its duty as tower in failing to place the Elizabeth R in a safe berth on the night of November 24th, with the result that on the following day, under great stress of weather, the scow was wrested from her mooring and caused to be washed ashore, whereby the damage was occasioned.

The libel was filed June 26, 1952 and the case came to trial nearly seven years later than the happening, namely, on April 25, 1957. The briefs and all papers were received by me on June 21, 1957.

The intensity of the storm in the waters of New York Harbor and vicinity has been recognized in the following cases: Petition of Bronx Towing Line, Inc., 1956 A.M.C. 166; Petition of Reading Co., D.C., 121 F.Supp. 808; Petition of Banks, D.C., 133 F.Supp. 276.

It is undisputed here that the storm was of at least equal severity in the vicinity of Haverstraw, on land and in the Hudson River; thus it seems unnecessary to repeat in detail the data with reference to the strength and force of the winds and the heavy fall of rain which prevailed almost throughout the entire day of the 25th. Moreover, the tide rose

in these waters not less than six feet above normal high water.

Reports of the Weather Bureau and attendant observations and comments are in evidence, and thus can be consulted in an examination of this record by a reviewing court.

The libelant does not argue that the said conditions were other than as above summarized; her case is that when the scow was moored on the night of the 24th at about 11:00 o'clock, the tug Terry, which conducted the operation, was at fault in handling the maneuver. So much is clear.

The respects in which the tug is said to have failed are vague in presentation at best, but are urged to be sufficient to call upon her owner, the respondent, to go forward with proof that the requirements of good seamanship were conformed to.

The task of the court is to examine the evidence to ascertain what it discloses, and if enough of substance has been shown to sustain a decision.

It must be said at once that neither party to the controversy has made a conspicuous effort to illuminate the entire situation. For instance:

There has been no adequate showing of the physical conditions existing in the so-called Basin on Novemer 24th, namely, the dimensions and number of the structures there maintained; their configuration and structural characteristics, nor their courses. Their functions have not been clearly shown.

The foregoing have not been the subject of testimony by any informed person such as the operating head of this branch of the New York Trap Rock Corporation; such a person would seem to have been available as a witness at the trial, or by deposition.

Perhaps the fact that the libelant's scow was under charter to that corporation, which was responsible for such docking facilities as were operated at this plant, may not be entirely unrelated to the failure stated.

No drawing, even a rough one, purporting to portray the said structures was offered for the guidance of the court to indicate whether the Elizabeth R was indeed in an exposed position to the wind conditions shown to prevail at the time when the mooring was effected.

Despite the lapse of time between the filing of the libel and the trial, no effort seems to have been made by either side to seek discovery in the nature of a deposition, of the captain of the tug Terry, nor seemingly were interrogatories propounded which could have been answered only by him.

The mere fact that neither the captain of the tug Terry nor of the tug Cornell, later to be referred to, was in the employ of the respondent at the time of the trial, does not take the place of efforts by either side to subpoena those persons. The court would have appreciated an opportunity to listen to the version of the Terry's captain concerning a protest said to have been made by Swan, the scowmaster of the Elizabeth R, concerning the position in which the scow was placed, and the alleged undertaking by the tug captain to return within an hour; that testimony is the principal basis of the libelant's case, and its importance therefore must have been apparent to the respondent ever since Swan's deposition was taken on July 11, 1956.

The respective witnesses who testified were:

Harry Schmidt, who has been connected with the libelant's enterprise since 1935. He described what he observed on arrival at Haverstraw on November 26, 1950, after the storm had subsided.

George Swan, who was the scowmaster on the Elizabeth R, whose deposition was taken as above stated.

The respondent called:

George Smith, who was the pilot on the tugboat Terry, of which Thomas Leonard was the captain.

Arthur Post, a tugboat master in the employ of the respondent, who resided in Haverstraw, and who was in his home on

the night of the 24th when the storm began to manifest itself. He visited the waterfront between 8:30 and 9:00 in the morning of the 25th and twice later in the day, and states what he observed.

The documentary evidence consists in a chart (C. & G.S. No. 282), sundry weather reports, the log sheet of the tugs Terry and Cornell, and two sketches showing the light scows later to be referred to, and the so-called light rack and adjacent cribbing.

The Josephine R was one of a fleet of not less than fifteen or more than twenty (the exact number is not agreed) light scows taken in tow by the tug Cornell from the vicinity of 52nd Street North River, New York, at about 5:00 o'clock in the afternoon of November 24, 1950, bound for the New York Trap Rock Hudson River plants at Haverstraw and Tompkins Cove.

The Terry was the helper tug, and the movement proceeded northerly apparently without incident, under a flood tide with the wind out of the southeast blowing at from 15 to 20 m. p. h.

Eight of the scows were taken from the tow when Haverstraw was reached, by the Terry, and towed to the said Basin. The remaining scows were to be taken to the Tompkins Cove plant by the Cornell.

The scows taken to Haverstraw were in two tiers of four each, of which the Elizabeth R was the starboard vessel in the second tier.

This maneuver began at about 11:30 p. m. of the 24th. The wind was still blowing out the southeast, at a force of from 15 to 20 m. p. h., and the tide was flooding.

The foregoing is undisputed, or would be stated in the form of a finding.

The New York Weather Bureau forecast for New York City and vicinity issued at 11:00 p. m. on the night in question was for "fresh to strong northeast winds tonight and Saturday gradually backing to north Saturday night and becoming moderate to fresh northwest Sunday." Also a southeast storm warning was noted for Long Island Sound.

In the so-called Basin as of November 24, 1950, there were two racks to which scows were made fast; one for loaded vessels (with trap rock) to be removed as required; the other for light scows which received their cargoes at a "loader" and were then moved to the loaded scow rack. Just what the loader was or where it was located or how the loading was accomplished is not disclosed in the evidence.

Seemingly the loaded scow rack projects from the shore toward the river, but the nature of its inshore structure, if any, is not shown; nor is its length, which is assumed to be in excess of 200 feet. Probably it was of timber construction and adequate, but whether sturdy, has not been confided to the court; whether it was so constructed as to act as a breakwater to protect the light rack next to be mentioned, is also left to the imagination.

The light scow rack seems to have been a nondescript structure which Swan refers to as a catwalk; it extended generally at right angles to the loaded scow rack, but whether it was attached thereto does not appear, nor is there a showing as to whether these two elements were separated by a given stretch of water. Its length was probably from 200 to 250 feet, which may be a mistaken estimate because of the vague nature of the testimony on the subject. There is no evidence of its dimensions or structural characteristics, but since Swan said that his light scow had tied up there for years, it is assumed to have been adequate for the purpose; how many such vessels could be so accommodated has not been made clear. Indeed the number that were lying at that rack when the Terry approached with her eight light scows on this occasion is the subject of conflicting observations which I am unable to reconcile.

Extending in an up-river (northerly) direction from the upper end of the rack and nearly in line with it, there was what was called a cluster of spiles. They were probably supports of a former building or structure of some undisclosed nature,

one element of which was a chute which extended over the water at a height of about six feet over the deck of a scow lying under it, at high water.

Seemingly the Terry's eight scows in two tiers, as stated, were made fast to other scows lying at the light rack, so that at least the aft tier extended beyond the northerly end of the light rack and alongside the spiles above referred to, in such a manner that the Elizabeth R was under the chute.

The witness Smith, who was the pilot on the Terry, drew a diagram of the way that the scows were made fast to one another, and to those already lying at the light rack; the showing of that diagram is in conflict with the testimony of Swan who says that there were only two scows at the light rack at the time; the witness Smith's testimony is the more convincing and is accepted, not only because of his demeanor on the witness stand, but because the witness Post, who also made a favorable impression, agreed to the accuracy of Smith's diagram but, using a red pencil, indicated the position of the 7″ lines of the several vessels as he observed them on Saturday morning, the 25th, after the storm had developed to very considerable proportions.

It is found therefore that the position of the Elizabeth R and the other scows which she accompanied at the light rack is as indicated on Respondent's Exhibit I.

It is testified to by both Swan and Smith that the captain of the Terry assisted the scowmen in putting out lines. As to this, Swan says that the captain was on the scow ahead of the tier of eight, and in answer to a question as to what he was doing, he said:

"He generally used to come up on the boats to see they were all right.

"Q. He was on the scow that was at the light scow catwalk? A. Yes, sir."

The mooring of these eight scows, including that of the Elizabeth R, was adequate because it held through the night and well into the morning of the 25th, on which day the storm developed to its greatest intensity. The foregoing is a finding.

By way of comment, it may be stated that there is no testimony whatever that any scow broke loose during the night or suffered damage, although there was pounding and the lines chafed, but none then carried away.

Post, by reason of his calling, was interested in observing the effects of the storm which began to develop in the early hours of the morning, and visited the waterfront as stated at 9:00 o'clock in the morning of Saturday, the 25th, and again at 1:00 p. m. and at 3:00 p. m.

On the occasion of his first observation, the wind still from the southeast, was blowing at an estimated force of 60 m. p. h. and heavy swells were breaking. At that time the scows were in the position shown on Respondent's Exhibit I, which was that in which they had been originally placed. He observed the Trap Rock employees trying to put lines out; he also observed the scow captains.

At 1:00 p. m., he estimated the wind force to be 70 m. p. h. and the tide had risen to 3 feet over the dock and the water was up to the office of the Trap Rock Corporation; this was two hours after high tide. By that time the whole unit had moved northerly but seemingly was still intact.

At 3:00 o'clock, he observed that the Elizabeth R was inland and water was over the top of the dock, and by this time the wind was blowing from 80 to 90 m. p. h.

His, and the testimony of both Smith and Swan, demonstrates that by the afternoon of Saturday not only had all of the light scows been blown or washed away from the light scow rack, but two of the loaded scows had been forced away from their rack and one of them was sunk. It is obvious that it would have made no difference if the Elizabeth R and the rest of the scows in her flotilla had been made fast directly to the light scow rack instead of being tied to those already there when the Terry flotilla arrived.

The storm was not reasonably to be anticipated when these scows were moored in the manner indicated; there were no storm warnings which should have taught either the captain of the Terry or of the Cornell that such unusual weather conditions were in the making, or could be anticipated to take effect in the waters here involved.

As to this, the 5:00 a. m. November 25th weather forecast of the New York Weather Bureau for New York City and vicinity and Northern New Jersey was:

"Cloudy, windy and mild with occasional rain today changing to snow and much colder late this afternoon or tonight. Highest temperature today in upper 50s lowest tonight 15–20 along the coast 10–15 in inland suburbs. Sunday clearing and much colder than today with diminishing winds. Highest in mid 20s."

The only evidence that the libelant relies upon to indicate that there was anything in the nature of a protest made by either Swan or any other scow captain with regard to the mooring of their scows, is found in the Swan deposition as follows:

(Referring to a conversation that he said he had with the captain of the Terry):

"Q. What did you have to say to the captain? A. Well, I was not very polite. I didn't say: Oh, gracious, goodness me, what are you leaving me here for.

"Q. What did you say, please? A. I said: What the hell kind of place is this to leave a guy? He said: Cap, we will be back in an hour. I will fix you all up. He told me that. And he told the others that. All the others."

It may be assumed that in July of 1956 Swan believed his testimony to be true. It is in that connection that Leonard's version of the episode—if there was one—would be informing.

Assuming that such a remark was made, it does not prove that the position was indeed unsafe because the contrary results from the fact that the scows were still at their mooring on the morning of November 25th, after the storm had hit and was then getting worse.

It is necessary to remember that the captain of the Terry was confronted with conditions as they were at about midnight on November 24th, and not as they developed during the 25th, in the absence of anything to warn him that any storm whatever was reasonably to be anticipated on either the 25th or the 26th.

Too much significance cannot be attached to the alleged undertaking of Leonard, the captain of the Terry—if it was given—to return in an hour. He may have said that in order to allay mere grumbling indulged in for its own sake.

Since the captain is shown to have examined the lines, in the opinion presently held he did all that could be reasonably expected of him to discharge his duties to moor these scows in a safe berth, under the conditions presented to him at the light rack.

Libelant's assertion that the Terry abandoned her tow lacks support in the evidence; there was no indication that these scows were in danger of any peril beyond the ordinary day by day experience of scows working in this trade.

No criticism of the lines finds support in the evidence. If they proved to be inadequate, it was not the fault of the tug which did not supply them.

The law with respect to the tower's duty as stated in O'Boyle v. Cornell, 2 Cir., 298 F. 95, 96, is as follows:

"When a tug master has brought his tow to her place of destination [the Terry had done this], and moored or landed her safely at that destination, his task is completed, and he is discharged from further responsibility". (Citing cases.)

As above stated, it is found that the Terry performed this duty. See also McWilliams v. Philadelphia & R. R. Co., 2 Cir., 203 F. 859; Brigham v. Cornell, 2 Cir., 18 F.2d 92.

The libelant urges that there was a duty on the part of the Terry to return

**132**

to this flotilla, but in view of the conditions which existed on the 25th there is an expectable lack of reference to a time or circumstance under which that duty arose; the evidence is persuasive that by reason of the raging storm on November 25th it would not have been feasible for the tug to have removed these scows to another place. Indeed, all of the captains made their way ashore during the afternoon. Swan was able to do it because the Elizabeth R was then on the beach and he was able to climb down by using a ladder.

With regard to the damage occasioned by the chute, that was entirely the result of the storm, and the fact that the tide rose six feet above expectable high water is what caused the chute to strike part of the structure of the Elizabeth R and damage it. That rise of tide was no more to be anticipated than any other incident of the storm.

From all of the foregoing, it results that the libelant's cause is dismissed for lack of proof, with costs.

Settle decree.